**FILED - LN**
February 11, 2026 3:40 PM
CLERK OF COURT
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY: __pjw__ /_____    SCANNED BY __CDD 2/12__

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**1:26-cv-468**
**Paul L. Maloney,**
**United States**
**District Judge**

ROBERT M. McALKICH III,

    Plaintiff,

Case#_____

v.

Judge_____

SHELLPOINT MORTGAGE SERVICING, LLC (f/k/a Newrez LLC d/b/a Shellpoint Mortgage Servicing),

STATE AUTO PROPERTY & CASUALTY INSURANCE COMPANY (f/k/a Liberty Mutual Insurance),

EQUIFAX INFORMATION SERVICES LL,

    Defendant,

_____/

## COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, AND DECLARATORY JUDGMENT

1.    Plaintiff Robert M. McAlkich III, by and through counsel, brings this action against Defendants Shellpoint Mortgage Servicing, LLC, State Auto Property & Casualty Insurance Company, and Equifax Information Services LLC, and alleges as follows:

### INTRODUCTION

2.    This action arises from a catastrophic fire loss on January 16, 2023, at the

property located at 1610 Spencer Road SE, Kalkaska, Michigan 49646, and the subsequent

wrongful conduct of Defendants in mishandling the insurance proceeds, misapplying escrow

unds, falsely reporting credit information, and wrongfully foreclosing on Plaintiff's home.

3.      Plaintiff Robert M. McAlkich III brings this action for damages arising from

Defendants' breaches of duty, fraud, conversion, wrongful foreclosure, Fair Credit Reporting

Act violations, Real Estate Settlement Procedures Act violations, and related state-law claims.

4.      The fire loss destroyed the dwelling on the Property on January 16, 2023.

Plaintiff's homeowner's insurance policy, Policy No. 1001110558, issued by State Auto,

covered the dwelling loss. Plaintiff's mortgage loan, Loan No. 9716285110, was being serviced

by Shellpoint.

5.      Upon the fire loss, Plaintiff submitted a claim to State Auto. State Auto,

through its claims agent Sterling Claims Management, issued insurance proceeds in the

amount of $304,640.05 to Shellpoint as mortgagee on August 4, 2023, by Check No.

1001366503, payable exclusively to Shellpoint with Plaintiff's name only in the memo line.

6.      By issuing these proceeds exclusively to Shellpoint and providing no notice to

Plaintiff, State Auto enabled Shellpoint's subsequent conversion and misapplication of the

funds.

7.      Shellpoint received the $304,640.05 in insurance proceeds, which was sufficient

to satisfy Plaintiff's entire mortgage obligation as of August 11, 2023, the exact payoff date and

amount calculated by State Auto itself. Despite this, Shellpoint failed to apply the proceeds to

Plaintiff's account, continued to charge escrow deposits for insurance already paid, charged

Plaintiff for Lender Placed Insurance while phantom escrow insurance charges continued,

initiated foreclosure proceedings on a non existant debt, and misapplied and converted the

[2]

proceeds.

8. Equifax, a consumer reporting agency, reported false and contradictory information on Plaintiff's credit file regarding the Shellpoint mortgage account, showing account status as "OVER 120 DAYS PAST DUE" with a balance of "$0" and a comment of "Foreclosure," and failed to conduct a reasonable reinvestigation when Plaintiff disputed this information on December 6, 2025.

9. As a result of Defendants' wrongful conduct, Plaintiff has suffered damages exceeding four million nine hundred thousand dollars, including loss of property, conversion of insurance proceeds, wrongful foreclosure damages, credit reporting damages, lost employment opportunities, displacement and homelessness lasting more than three years, escrow abuse and phantom insurance charges, and damages for which treble damages are available under Michigan law.

10. Plaintiff seeks actual damages, statutory damages, treble damages, punitive damages, attorney fees, costs, prejudgment interest, postjudgment interest, injunctive relief, and declaratory relief.

11. Plaintiff demands a jury trial on all issues so triable.

## PARTIES

12. Plaintiff Robert M. McAlkich III is an individual residing at 8698 Community Boulevard, Warren, Michigan 48093. Plaintiff is the owner of the Property and the borrower under the mortgage loan being serviced by Shellpoint.

13. Defendant Shellpoint Mortgage Servicing, LLC, formerly known as Newrez LLC doing business as Shellpoint Mortgage Servicing, is a mortgage servicer and debt collector licensed to do business in Michigan. Shellpoint serviced Plaintiff's mortgage loan,

[3]

Loan No. 9716285110, from on or before January 2023 through the present. Shellpoint received $304,640.05 in insurance proceeds on August 4, 2023, failed to apply the proceeds to Plaintiff's account, continued charging escrow deposits for insurance, initiated wrongful foreclosure, and converted and misapplied insurance proceeds.

14.    Prior to Shellpoint's acquisition of servicing in or about November/December 2022, Plaintiff's loan was serviced by Caliber Home Loans. In or about February 2022, Plaintiff became approximately 30 days delinquent and thereafter entered an approved forbearance/loss-mitigation program with the prior servicer covering subsequent months leading into the servicing transfer. Plaintiff possesses written forbearance approval documentation for substantial portions of 2022.

15.    Upon boarding the loan, Shellpoint did not reflect the active forbearance status and treated the account as delinquent/defaulted for servicing and collection purposes, including demanding payment and later furnishing to third parties and/or consumer reporting agencies that Plaintiff had not made a payment since 2022, without disclosing the authorized forbearance context.

16.    In Shellpoint's initial servicing transfer/introductory correspondence to Plaintiff dated November, 2022, Shellpoint stated words to the effect that it "is a debt collector" and that the communication was for the purpose of collecting a debt.

17.    Pleading in the alternative, if Shellpoint contends the loan was not 'in default' at the time it acquired servicing, then the operative status at transfer was an approved forbearance/loss-mitigation status. Shellpoint's subsequent delinquency/default posture, foreclosure escalation, and delinquency furnishing were caused by Shellpoint's failure to board and service the loan consistent with that status and to correct the status after notice.

[4]

18. Defendant State Auto Property & Casualty Insurance Company, formerly known as Liberty Mutual Insurance, is an insurance company that issued homeowner's insurance Policy No. 1001110558 to Plaintiff covering the Property. State Auto processed the insurance claim through its claims agent Sterling Claims Management, coordinated with Shellpoint's claims agent instead of processing Plaintiff's claim, issued exclusive payment to Shellpoint without notice to Plaintiff, and facilitated Shellpoint's conversion of insurance proceeds.

19. Defendant Equifax Information Services LLC is a consumer reporting agency maintaining credit files and furnishing credit information to third parties. Equifax reported false and contradictory information about Plaintiff's mortgage account and failed to conduct a reasonable reinvestigation upon Plaintiff's dispute in December 2025.

## JURISDICTION AND VENUE

20. This Court has subject-matter jurisdiction under 28 U.S.C. Section 1331 because Plaintiff asserts federal claims arising under the Fair Credit Reporting Act, 15 U.S.C. Section 1681 et seq., the Real Estate Settlement Procedures Act, 12 U.S.C. Section 2601 et seq., the Fair Debt Collection Practices Act, 15 U.S.C. Section 1692 et seq., and implied federal causes of action for conversion of property interests and wrongful foreclosure.

21. This Court has supplemental jurisdiction under 28 U.S.C. Section 1367(a) over Plaintiff's state-law claims including conversion, breach of fiduciary duty, fraud, unjust enrichment, wrongful foreclosure, and insurance bad faith, which arise out of the same operative facts as the federal claims.

22. Venue is proper in the Western District of Michigan, Southern Division, Lansing, under 28 U.S.C. Section 1391 because the Property is located in Kalkaska County, Michigan, within the Western District, Shellpoint's servicing actions including wrongful

[5]

foreclosure initiation took place in this District, State Auto's claim handling and exclusive mortgagee payment occurred in connection with property located in this District, and Equifax's false reporting affected Plaintiff's credit in this District.

## FACTUAL ALLEGATIONS

23.    Plaintiff owned the dwelling located at 1610 Spencer Road SE, Kalkaska, Michigan 49646. Plaintiff obtained homeowner's insurance from State Auto under Policy No. 1001110558, with dwelling coverage limits of $321,700 and a stated deductible of $1,000. The policy was in full force and effect on January 16, 2023.

24.    On January 16, 2023, a catastrophic fire occurred at the Property, destroying the dwelling. The fire loss was a covered event under the insurance policy, with no applicable exclusions or coverage denials.

25.    Plaintiff reported the loss to State Auto on or about January 16, 2023, and retained a public adjuster to assist with claim documentation and recovery efforts.

26.    At the time of the fire loss, Plaintiff's mortgage loan, Loan No. 9716285110, was being serviced by Shellpoint Mortgage Servicing, LLC. Shellpoint held a mortgagee interest under the mortgage and received notice of the insurance claim through the mortgage clause.

27.    On June 15, 2023, Andrea Renzi of Sterling Claims Management submitted a First Notice of Loss to State Auto on behalf of the mortgagee in connection with Plaintiff's fire loss claim, Claim No. PR-0000000-467718.

28.    On June 16, 2023, at 7:37 a.m., Melissa Tomlinson, identified as State Auto Senior Litigation Claims Specialist, responded directly to Andrea Renzi at Sterling Claims Management and stated: "Good morning, We are in receipt of your email dated 6/15/2023 with

[6]

the First Notice of Loss. Please provide a letter of representation for Caliber Home Loans so that we can communicate with you regarding the above referenced file." This email shows that State Auto's Property Litigation Specialist directed claims communications to the mortgagee's agent, not to Plaintiff, the named insured.

29. On June 16, 2023, at 1:03 p.m., Andrea Renzi of Sterling Claims Management responded to Melissa Tomlinson at State Auto and stated: "The mortgage is now being serviced by Shellpoint. Please see the attached." State Auto's Senior Litigation Claims Specialist now had full knowledge that Shellpoint was the active mortgagee and servicer.

30. On August 4, 2023, State Auto issued a check, Check No. 1001366503, in the amount of $304,640.05, payable exclusively to "Shellpoint Mortgage Servicing," with the memo line reading: "For the account of Robert McAlkich; Loan 9716285110." The check was issued through Sterling Claims Management as State Auto's claims agent. Plaintiff's name appeared only in the memo line, not as a co-payee or recipient.

31. In an April 22, 2025, email response to Plaintiff's inquiry, Becky Senn, AIC, Large Loss Team Manager, State Auto Insurance, calculated and confirmed the payment as follows: "$296,453.67 - Principal / $13,810.76 - Interest / equals $310,264.43 - Payoff as of 8/11/23 / less ($4,624.38) applied per diem 1/16/23 through 8/11/23 (207 days times $22.34 daily per diem) / equals $305,640.05 / less ($1,000.00) deductible / equals $304,640.05 - Payment due." This email confirms that State Auto calculated the $304,640.05 payment as the full and complete payoff amount necessary to satisfy Plaintiff's entire mortgage obligation as of August 11, 2023.

32. In a February 19, 2025, response to the Michigan Department of Insurance & Financial Services regarding Plaintiff's DOI complaint, File Number 232488, State Auto,

[7]

through Hannah Horwitz, Sr. Consumer Affairs Specialist II, stated: "Please note the insured's failure to submit the SSPOL was under review when the mortgagee became involved and submitted documentation to present a claim. A notice outlining the SSPOL request was sent to the mortgagee and is enclosed for your review. We have also enclosed relevant documentation submitted by the mortgagee." This admission establishes that Plaintiff's Sworn Proof of Loss was incomplete and under review when State Auto elected to process the mortgagee's claim instead of requiring Plaintiff to complete his own proof of loss.

33.    By issuing the August 4, 2023, check payable exclusively to Shellpoint Mortgage Servicing with Plaintiff's name only in the memo line, State Auto structured the payment in a manner that excluded Plaintiff from direct receipt of the $304,640.05 payment, control over the insurance proceeds, visibility into how the proceeds were applied to the mortgage account, and ability to verify or contest Shellpoint's application of the funds.

34.    On August 4, 2023, Shellpoint received the $304,640.05 insurance payment from State Auto through Sterling Claims Management, Check No. 1001366503.

35.    Upon receipt of insurance proceeds payable to the mortgagee for payoff purposes, Shellpoint had a duty to apply the proceeds to Plaintiff's mortgage account in satisfaction of the obligation, provide Plaintiff with a clear accounting of how the proceeds were applied, and if the proceeds exceeded the payoff amount, return or credit the surplus to Plaintiff.

36.    State Auto's own calculation, shown in the April 22, 2025, email from Becky Senn, shows that Plaintiff's mortgage obligation as of August 11, 2023, the payoff date, was exactly $304,640.05. The $304,640.05 insurance payment was sufficient to completely satisfy Plaintiff's entire mortgage obligation.

37.     Despite receiving the $304,640.05 insurance payment in August 2023, Shellpoint did not transparently credit this payment to Plaintiff's account or provide Plaintiff with a clear accounting of how the proceeds were applied.

38.     Plaintiff's insurance policy with State Auto was non-renewed effective March 26, 2023. After the policy lapsed, Shellpoint continued to charge escrow deposits for insurance coverage as if the policy remained active. These charges were phantom charges because the policy was no longer in effect after March 26, 2023, Shellpoint continued to withdraw escrow funds for insurance that did not exist, and Shellpoint knew or should have known that the policy had lapsed.

39.     Beginning in May 2023, Shellpoint charged Plaintiff for both phantom escrow insurance, which is the regular monthly escrow deduction as if the original policy remained active, and Lender Placed Insurance, which are separate monthly charges for insurance purchased by Shellpoint to protect its interests. This simultaneous charging pattern continued through September 2023, with LPI charges of $644.30 on May 26, 2023, $211.82 on June 26, 2023, $214.77 on July 26, 2023, $214.77 on August 26, 2023, and $211.82 on September 26, 2023, for a total of $1,497.48 in LPI charges. While phantom escrow insurance continued, Shellpoint also charged LPI, resulting in double charging for overlapping months.

40.     Shellpoint's failure to transparently credit the $304,640.05 insurance payment to Plaintiff's account, combined with continued charging of phantom escrow insurance, simultaneous charging of LPI, initiation of foreclosure proceedings without accounting for the insurance payment, and misapplication of the insurance proceeds, constitutes conversion of the insurance proceeds by Shellpoint.

41.     Equifax reported the following false and contradictory information on Plaintiff's

[9]

credit file regarding the Shellpoint mortgage loan: Account Status of "OVER_120_DAYS_PAST_DUE," Balance of "$0," and Comment of "Foreclosure." These items are mutually exclusive. An account cannot simultaneously have a $0 balance and be "over 120 days past due" with foreclosure status.

42.    On December 6, 2025, Plaintiff called Equifax to dispute the mortgage tradeline's internally contradictory reporting (including a $0 balance alongside "over 120 days past due" and foreclosure coding). Equifax assigned Confirmation Number 5340574595, advised that the tradeline would be investigated, and recorded the dispute.

43.    On or about December 6, 2025, Equifax generated and/or mailed Plaintiff a disclosure packet associated with Confirmation Number 5340574595 that simultaneously contained (a) pages stating "Prepared for: ROBERT MCALKICH III" and (b) a cover/mailing label addressed to "ANDREA F DIMARCO" at Plaintiff's address. This commingling of consumer identifiers is consistent with a mixed-file condition and undermines the reliability of Equifax's reporting and reinvestigation for Plaintiff's file.

44.    After Plaintiff disputed the contradictory mortgage reporting, Equifax was required to conduct a reasonable reinvestigation under 15 U.S.C. § 1681i(a), including reviewing all relevant information, obtaining and considering documentation necessary to resolve the dispute, and deleting or modifying information that could not be verified as accurate. Equifax instead relied primarily on the furnisher's response and did not obtain or evaluate documentary proof of the August 2023 payoff-level insurance proceeds or how those proceeds were applied to the mortgage account.

45.    Equifax further failed to provide Plaintiff the statutorily required description of the procedure used to determine the accuracy and completeness of the disputed information

[10]

after Plaintiff requested it, as required by 15 U.S.C. § 1681i(a)(6)–(7). Equifax's refusal to provide meaningful disclosure regarding the reinvestigation process hindered Plaintiff's ability to challenge the verification and correct the file.

46.     During the dispute call, Equifax's representative repeatedly attempted to divert Plaintiff toward identity-theft reporting (police report / FTC complaint), rather than addressing the actual dispute: materially inaccurate and internally inconsistent delinquency, foreclosure, balance, and payment-history reporting. This diversion, combined with the mixed-file indicators reflected in Equifax's own disclosure packet, supports that Equifax did not perform a reasonable, good-faith reinvestigation targeted at the disputed mortgage tradeline.

47.     The false reporting resulted from Shellpoint's misrepresentations to Equifax regarding the account status. Shellpoint represented to Equifax that Plaintiff was delinquent and in foreclosure, despite Shellpoint's receipt of $304,640.05 in insurance proceeds, Shellpoint's knowledge that these funds were sufficient to satisfy the entire obligation, and Shellpoint's possession of these funds without transparent crediting to Plaintiff's account.

48.     The foreclosure timeline was as follows:

49.     Fire loss occurred on January 16, 2023. Insurance proceeds of $304,640.05 were paid to Shellpoint on August 4, 2023, sufficient to satisfy the mortgage. Foreclosure notice was issued on December 8, 2023. Foreclosure sale was conducted on February 16, 2024. Foreclosure redemption period expired in August 2024.

50.     The foreclosure was wrongful because Shellpoint had received sufficient insurance proceeds to satisfy the mortgage in full, Shellpoint failed to apply these proceeds to Plaintiff's account, Shellpoint initiated foreclosure without accounting for the insurance payment, and Shellpoint's conduct violated the implied covenant of good faith and fair dealing

[11]

under Michigan law.

51.      Because Shellpoint had received $304,640.05 in insurance proceeds in August 2023, which was sufficient to satisfy the entire mortgage obligation, there was no legitimate cure amount for Plaintiff to reinstate the mortgage. Plaintiff was foreclosed upon despite having a fully satisfied mortgage via insurance proceeds received by Shellpoint.

52.      Equifax's violations were willful, as evidenced by Equifax's knowledge of FCRA requirements, Equifax's failure to conduct independent investigation beyond furnisher's response, Equifax's refusal to disclose investigation methodology to Plaintiff on December 6, 2025, Equifax's steering of dispute toward identity theft instead of investigating materially inaccurate and internally inconsistent delinquency/payment-history reporting and unreasonable reinvestigation/verification after dispute. contamination, and Equifax's knowledge that the reported information was contradictory and impossible.

53.      Shellpoint's violations were willful, as evidenced by Shellpoint's knowledge of FCRA duties, Shellpoint's continued reporting of delinquent status despite receipt of payoff level insurance proceeds, Shellpoint's failure to correct reporting to reflect the insurance payment's application, and Shellpoint's deliberate reporting that misrepresented Plaintiff's account status.

## COUNT I - CONVERSION

54.      Plaintiff incorporates by reference paragraphs 1 through 46 as if fully set forth herein.

55.      Conversion is the unauthorized assumption and exercise of control over personal property belonging to another, depriving that person of use and enjoyment of the property.

[12]

56.    On August 4, 2023, Shellpoint received $304,640.05 in insurance proceeds, Check No. 1001366503, that were paid directly to Shellpoint as a result of Shellpoint's claim filing and State Auto's exclusive mortgagee payment structure.

57.    These funds belonged to Plaintiff because Plaintiff was the homeowner and insured, the insurance policy was purchased and paid for by Plaintiff's escrow deposits, the loss was to Plaintiff's dwelling, the funds were paid to Shellpoint only due to the mortgage clause and mortgagee interest, and Shellpoint held the funds as an agent or mortgagee, not as owner.

58.    Shellpoint's duty upon receipt of these funds was to apply them to Plaintiff's mortgage obligation or, if the mortgage was satisfied, return or credit the surplus to Plaintiff.

59.    State Auto's own calculation proves that the $304,640.05 payment was exactly sufficient to satisfy Plaintiff's entire mortgage obligation as of August 11, 2023, as confirmed in Becky Senn's April 22, 2025, email showing Principal of $296,453.67 plus Interest of $13,810.76 equaling $310,264.43, less per diem adjustment of $4,624.38, less deductible of $1,000.00, yielding net payoff of $304,640.05.

60.    Despite receiving the $304,640.05 payment in August 2023, Shellpoint did not transparently credit the payment to Plaintiff's account, did not provide Plaintiff with a clear accounting, continued to charge phantom escrow insurance after policy lapse, charged simultaneous LPI premiums, initiated foreclosure without accounting for the insurance payment, and misappropriated and converted the funds. Shellpoint exercised unauthorized dominion and control over $304,640.05 in funds that belonged to Plaintiff or belonged to Plaintiff to the extent they exceeded the mortgage payoff.

61.    This unauthorized exercise of control was inconsistent with Plaintiff's property rights and constitutes conversion.

62.    As a result of Shellpoint's conversion, Plaintiff suffered damages including

[13]

loss of the $304,640.05 in proceeds and all consequential damages flowing from the misapplication of funds, including loss of property, displacement, credit damage, and employment loss.

63.    WHEREFORE, Plaintiff requests judgment against Shellpoint for actual damages of $304,640.05, treble damages under MCL 600.2919a of $913,920.15, additional damages for consequential losses of $500,000 or more to be proven at trial, attorney fees and costs, and prejudgment and postjudgment interest. TOTAL FOR COUNT I: $1,718,560 or more.

## COUNT II - BREACH OF FIDUCIARY DUTY

64.    Plaintiff incorporates by reference paragraphs 1 through 56 as if fully set forth herein.

65.    Shellpoint, as a mortgage servicer and holder of Plaintiff's escrow account, owed a fiduciary duty to Plaintiff to manage escrow funds with care and transparency, apply insurance proceeds received on Plaintiff's behalf to the mortgage account, provide accurate accounting of funds received and applied, and act in Plaintiff's best interest with respect to escrow management.

66.    Shellpoint breached this fiduciary duty by failing to apply $304,640.05 in insurance proceeds to Plaintiff's account, continuing to charge escrow deposits for phantom insurance after the policy lapsed, charging simultaneous LPI premiums while phantom escrow insurance continued, failing to provide transparent accounting to Plaintiff, initiating foreclosure without accounting for received insurance proceeds, and misappropriating escrow funds.

67.    Shellpoint's breaches were willful and knowing, done with disregard for

[14]

Plaintiff's rights.

68.    As a result, Plaintiff suffered damages including loss of escrow funds, foreclosure related harm, and consequential losses.

69.    WHEREFORE, Plaintiff requests judgment against Shellpoint for actual damages of $100,000 or more for escrow abuse and mismanagement, punitive damages of $200,000 or more for willful breach of fiduciary duty, attorney fees and costs, and prejudgment and postjudgment interest. TOTAL FOR COUNT II: $300,000 or more.

## COUNT III - FAIR CREDIT REPORTING ACT VIOLATIONS VIOLATIONS OF THE FAIR CREDIT REPORTING ACT ("FCRA") 15 U.S.C. § 1681 et seq.

### *(Against Equifax Information Services LLC and Shellpoint Mortgage Servicing, LLC)*

70.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

71.    The FCRA was enacted to ensure fair and accurate credit reporting, to require consumer reporting agencies ("CRAs") to adopt reasonable procedures to assure maximum possible accuracy, and to require furnishers to conduct reasonable investigations and correct inaccurate information after receiving notice of disputes from CRAs.

### A. FCRA CLAIMS AGAINST EQUIFAX (CRA DUTIES)

72.    15 U.S.C. §§ 1681e(b) and 1681i(a)

73.    Equifax is a "consumer reporting agency" within the meaning of 15 U.S.C. § 1681a(f) and regularly assembles and evaluates consumer credit information and furnishes consumer reports to third parties for a fee.

74.    Equifax prepared and maintained Plaintiff's consumer file and published consumer reports about Plaintiff to third parties that included the Shellpoint mortgage

[15]

tradeline and related status/history fields.

75. Equifax reported materially inaccurate and/or materially misleading information regarding Plaintiff's mortgage account, including internally contradictory reporting (e.g., reporting a $0 balance while simultaneously reporting serious past-due/foreclosure coding and major delinquency history), and/or other inaccurate fields tied to delinquency onset and historical account information, as described in the factual allegations above.

76. Equifax also exhibited file-matching/identity integrity failures consistent with a "mixed file." In connection with Plaintiff's Equifax dispute on or about December 6, 2025 (Equifax Confirmation No. 5340574595), Equifax generated and/or mailed Plaintiff a disclosure/dispute packet that included another consumer identifier (including "ANDREA F. DIMARCO" and/or a different consumer's identifying information) commingled within materials associated with Plaintiff's request and address, reflecting contamination/commingling of consumer identifiers and defective file controls.

77. Section 1681e(b) requires Equifax to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates.

78. Equifax violated § 1681e(b) by failing to maintain and follow reasonable procedures to assure maximum possible accuracy, including by: (a) publishing internally contradictory and materially misleading mortgage tradeline reporting; and (b) maintaining/issuing a file/disclosure packet reflecting commingled consumer identifiers consistent with a mixed-file condition.

79. On or about December 6, 2025 and thereafter, Plaintiff disputed the inaccurate mortgage tradeline reporting and the integrity of his Equifax file through Equifax's dispute

[16]

process, including disputing the contradictory reporting and requesting correction of the inaccurate delinquency/foreclosure history and related fields.

80.    Upon Plaintiff's dispute, § 1681i(a) required Equifax to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate, to review all relevant information provided by the consumer, and to record/delete/modify information found to be inaccurate or that could not be verified.

81.    Equifax violated § 1681i(a) because its reinvestigation was unreasonable under the circumstances, including because Equifax: (a) failed to perform a reinvestigation targeted at the mixed-file contamination evidenced by Equifax's own packet; (b) failed to resolve facially impossible contradictions in the mortgage tradeline; (c) relied primarily on automated routing and/or the furnisher's response without obtaining and evaluating documentation needed to reconcile the disputed reporting; and (d) failed to correct, delete, or meaningfully modify the inaccurate/misleading reporting.

82.    Equifax further failed to provide Plaintiff a meaningful description of the procedure used to determine the accuracy and completeness of the disputed information after Plaintiff's request, as required by 15 U.S.C. § 1681i(a)(7).

83.    As a direct and proximate result of Equifax's violations of §§ 1681e(b) and 1681i(a), Plaintiff suffered actual damages, including but not limited to (Tier 3) credit harm, loss of credit opportunities, increased borrowing costs, adverse credit decisions, and related consequential economic harm, as well as emotional distress attributable to the credit reporting confusion and stonewalling.

84.    Equifax's violations were at least negligent. To the extent Equifax continued to publish and/or verify materially contradictory information and failed to address mixed-file

[17]

contamination after notice and dispute, Equifax's conduct was willful or in reckless disregard of its duties within the meaning of 15 U.S.C. § 1681n.

## B. FCRA CLAIM AGAINST SHELLPOINT (FURNISHER DUTIES AFTER NOTICE) 15 U.S.C. § 1681s-2(b)

85.    Shellpoint is a "furnisher" of information to CRAs, including Equifax and TransUnion, within the meaning of the FCRA.

86.    Shellpoint furnished information concerning Plaintiff's mortgage account to one or more CRAs, including account status, delinquency/foreclosure coding, historical account information, and monthly payment-history reporting.

87.    Plaintiff disputed the accuracy and completeness of Shellpoint's furnished information through the CRA dispute process (including the December 6, 2025 Equifax dispute and related disputes), challenging the delinquency/foreclosure narrative, the contradictory $0 balance/past-due reporting, and the accuracy of historical delinquency onset and payment history during periods in which Plaintiff was in forbearance and/or otherwise not properly treated as delinquent.

88.    Upon information and belief, Equifax and/or other CRAs provided notice of Plaintiff's disputes to Shellpoint pursuant to the CRA–furnisher dispute notification process.

89.    Upon receiving CRA notice of the dispute(s), Shellpoint was required under § 1681s-2(b) to: (a) conduct a reasonable investigation of the disputed information; (b) review all relevant information provided by the CRA; (c) report the results of its investigation to the CRA; and (d) if the information was inaccurate, incomplete, or could not be verified, promptly modify, delete, or permanently block the reporting of that information.Shellpoint violated § 1681s-2(b) by failing to conduct a reasonable investigation and by continuing to furnish and/or verify information that was inaccurate,

[18]

incomplete, and/or materially misleading, including by: (a) maintaining a delinquency/foreclosure narrative that contradicted payoff-level insurance proceeds and/or other servicing facts; (b) failing to correct delinquency onset/history fields and historical account information that materially worsened the appearance of default; and (c) failing to reconcile and correct the reporting despite the availability of servicing records, payoff communications, and/or forbearance documentation.

90.      As a direct and proximate result of Shellpoint's § 1681s-2(b) violations, Plaintiff suffered actual damages, including (Tier 3) credit damage and adverse credit outcomes, increased borrowing costs, loss of opportunities, and related consequential economic harm, as well as emotional distress attributable to the persistent publication of inaccurate credit information.

91.      Shellpoint's violations were at least negligent. To the extent Shellpoint verified the same inaccurate/misleading delinquency and foreclosure reporting after disputes and after being put on notice of documentary reasons the reporting was wrong, Shellpoint acted willfully or in reckless disregard of its duties within the meaning of 15 U.S.C. § 1681n.

**PRAYER FOR RELIEF (AS TO COUNT III)**

92.      WHEREFORE, Plaintiff requests judgment against Equifax and Shellpoint, and seeks:

93.      Actual damages pursuant to 15 U.S.C. §§ 1681n(a)(1)(A) and/or 1681o(a)(1);

94.      Statutory damages (as applicable) and punitive damages for willful violations pursuant to 15 U.S.C. § 1681n(a);

95.      Costs of suit and reasonable attorney's fees where authorized pursuant to 15 U.S.C. §§ 1681n(a)(3) and 1681o(a)(2);

[19]

96.     Pre- and post-judgment interest as permitted by law; and

97.     Such other and further relief as the Court deems just and proper.

**COUNT IV - REAL ESTATE SETTLEMENT PROCEDURES ACT VIOLATIONS**

98.     Plaintiff incorporates by reference paragraphs 1 through 77 as if fully set forth herein.

99.     Shellpoint is a mortgage servicer subject to RESPA, 12 U.S.C. Section 2602(b).

100.    RESPA requires servicers to respond to borrower inquiries about the loan account within specified timeframes, provide accurate escrow accounting statements, and apply payments to the account in accordance with the promissory note and security instrument.

101.    Shellpoint violated RESPA by failing to transparently account for the $304,640.05 insurance payment, continuing to charge escrow deposits for insurance after the policy lapsed, charging simultaneous LPI and phantom escrow insurance premiums, failing to provide accurate accounting of funds received and applied, and misapplying the insurance payment to prevent Plaintiff from understanding his account status.

102.    Shellpoint's violations were willful and knowing, done with intent to avoid accountability and to enable foreclosure.

103.    As a result, Plaintiff suffered damages including confusion regarding his account status, inability to prevent wrongful foreclosure, and consequential losses.

104.    WHEREFORE, Plaintiff requests judgment against Shellpoint for actual damages of $50,000 or more, statutory damages of $5,000 per violation under 12 U.S.C. Section 2605(e) for multiple violations, attorney fees and costs, and prejudgment and post judgment interest. TOTAL FOR COUNT IV: $50,000 or more.

[20]

**COUNT V - BREACH OF INSURANCE CONTRACT AND IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

105.    Plaintiff incorporates by reference paragraphs 1 through 83 as if fully set forth herein.

106.    State Auto issued homeowners Policy No. 1001110558 to Plaintiff covering the dwelling located at 1610 Spencer Road SE, Kalkaska, Michigan, with dwelling coverage limits and a stated deductible of $1,000.

107.    A covered fire loss occurred on January 16, 2023. Plaintiff submitted and pursued a claim under the policy, Claim No. PR-0000000-467718.

108.    State Auto's claim handling breached the insurance contract because State Auto processed and approved the mortgagee's incomplete claim submission without requiring the insured to complete his own proof of loss, in violation of standard claims procedures and the implied covenant of good faith and fair dealing. State Auto issued payment exclusively to the mortgagee without making Plaintiff a joint payee or providing Plaintiff with notice of the payment, inconsistent with Michigan insurance practice. State Auto provided no contemporaneous notice that a $304,640.05 check had been issued to Shellpoint. State Auto's payment structure ensured that Shellpoint, not Plaintiff, would have exclusive control over the insurance proceeds while State Auto knew that exclusive payment would deny Plaintiff visibility into and control over the funds.

109.    State Auto's conduct breached the implied covenant of good faith and fair dealing by coordinating directly with the mortgagee's agent while excluding the named insured from the claims process, processing a mortgagee initiated claim in place of the insured's claim despite the insured's claim being incomplete but under active review, issuing payment exclusively to the mortgagee without notice to the insured thereby excluding the insured from control and visibility over policy proceeds, and taking an adverse claim position toward the insured by denying coverage while simultaneously paying the mortgagee's coverage, thereby denying the insured the benefit of the bargain.

[22]

110.    As a direct and proximate result of State Auto's breach of contract and implied covenant, Plaintiff suffered damages including loss of control and visibility over $304,640.05 in insurance proceeds, inability to monitor, verify, or contest how Shellpoint applied the proceeds to the mortgage account, impaired ability to protect his interests in the insurance claim and mortgage account, facilitation of Shellpoint's subsequent misapplication and conversion of the proceeds, and out of pocket losses and consequential harms including loss of property, displacement, credit damage, and employment related losses, to be proven at trial.

111.    Plaintiff seeks a declaration that coverage existed for the January 16, 2023, fire loss under Policy No. 1001110558, State Auto owed contractual benefits to Plaintiff as the named insured, State Auto's denial of coverage to Plaintiff was improper and in breach of the insurance contract, and State Auto's exclusive payment to the mortgagee, without notice to the insured, was improper and contrary to insurance contract standards and Michigan law.

112.    WHEREFORE, Plaintiff requests declaratory relief that coverage existed and State Auto owed contractual benefits, compensatory damages for breach of contract, damages for breach of implied covenant of good faith and fair dealing, costs and attorney fees, prejudgment and postjudgment interest as allowed by law, and such other and further relief as the Court deems just and proper. TOTAL FOR COUNT V: $850,000 or more.

## COUNT V-A - AIDING AND ABETTING CONVERSION / JOINT TORTIOUS CONDUCT

113.    Plaintiff incorporates by reference the preceding paragraphs and all facts in COUNT V and paragraphs alleging Shellpoint's conversion in COUNT I.

114.    Plaintiff alleges that Shellpoint exercised dominion and control over specifically identifiable insurance proceeds in the amount of $304,640.05 in a manner

inconsistent with Plaintiff's rights and contrary to the payoff-based purpose for which the proceeds were issued, as fully alleged in COUNT I.

115. State Auto's Melissa Tomlinson, Sr. Litigation Claims Specialist, entered into direct communication with Andrea Renzi of Sterling Claims Management, Shellpoint's claims agent, on June 16, 2023, requesting a letter of representation so that State Auto could establish an ongoing communication channel with the mortgagee's agent. After Andrea Renzi confirmed on June 16, 2023, at 1:03 p.m., that the mortgage was being serviced by Shellpoint, State Auto knew that Shellpoint was the mortgagee and servicer. On August 4, 2023, State Auto issued Check No. 1001366503 for $304,640.05 payable exclusively to "Shellpoint Mortgage Servicing," with Plaintiff's name only in the memo line. This payment structure ensured that Shellpoint, not Plaintiff, would have exclusive control over the insurance proceeds.

116. State Auto knew from the June 16 emails and the nature of mortgagee servicer relationships that issuing a check payable only to Shellpoint would exclude Plaintiff from receipt of or control over the proceeds, prevent Plaintiff from monitoring how the proceeds were applied to the mortgage account, prevent Plaintiff from contesting improper application of the proceeds, and give Shellpoint exclusive authority to apply the funds without Plaintiff's knowledge or consent.

117. State Auto's conduct in structuring exclusive payment to Shellpoint directly facilitated Shellpoint's subsequent conversion by ensuring Shellpoint had sole possession and control of $304,640.05 in insurance proceeds, denying Plaintiff any direct notification of the payment, depriving Plaintiff of the ability to verify, monitor, or contest how Shellpoint applied the funds, and creating a circumstance in which Shellpoint could misapply the proceeds without Plaintiff's knowledge or interference.

118.     Shellpoint, through Sterling Claims Management, knowingly participated in and benefited from State Auto's decision to process Shellpoint's claim instead of Plaintiff's claim, issue exclusive payment to Shellpoint, and provide no notice to Plaintiff.

119.     State Auto's conduct in structuring exclusive payment to Shellpoint was a substantial factor in causing Shellpoint's subsequent misapplication and conversion of the $304,640.05 in insurance proceeds. But for State Auto's exclusive payment structure, which denied Plaintiff control and visibility, Plaintiff would have been in a position to discover and prevent Shellpoint's misapplication.

120.     Plaintiff suffered damages including loss of control and visibility over $304,640.05 in insurance proceeds, inability to prevent or mitigate Shellpoint's misapplication of the proceeds, and all consequential damages flowing from Shellpoint's conversion, including loss of property, displacement, credit damage, and employment related losses, to be proven at trial.

121.     WHEREFORE, Plaintiff requests judgment for compensatory damages jointly and severally from State Auto and Shellpoint for aiding and abetting conversion, costs and attorney fees, prejudgment and postjudgment interest as allowed by law, and such other and further relief as the Court deems just and proper. TOTAL FOR COUNT V-A: $850,000 or more (alternative basis to COUNT V).

## COUNT VI - FRAUD, MISLEADING "REBUILD" COMMUNICATIONS

122.     Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

123.     Shellpoint Mortgage Servicing, LLC, through written borrower communications, sent Plaintiff a letter dated on or about October 18, 2023, representing that Shellpoint was "here to help with the rebuilding process" and could work with Plaintiff on reconstruction.

124.    By October 18, 2023, Shellpoint had already received substantial fire loss insurance proceeds issued based on payoff information for Plaintiff's loan and had possession of information necessary to provide a transparent accounting and crediting of those proceeds. Despite that, Shellpoint continued to communicate about "rebuilding" while failing to provide clear payoff credit and accounting that would determine Plaintiff's ability to move forward with reconstruction without foreclosure pressure.

125.    Plaintiff relied on Shellpoint's communications as indicating a cooperative servicing posture and continued pursuing resolution and rebuilding options, while Shellpoint's payoff crediting posture and subsequent foreclosure related conduct deprived Plaintiff of a meaningful opportunity to stabilize the mortgage situation and proceed with rebuilding.

126.    Plaintiff suffered damages including foreclosure related harm, displacement, and related consequential losses to be proven at trial.

127.    WHEREFORE, Plaintiff requests judgment for compensatory damages, costs, interest, and such other relief as the Court deems just. TOTAL FOR COUNT VI: $400,000 or more.

## COUNT VII - FRAUD, MISLEADING PAYOFF REPRESENTATIONS

128.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

129.    Shellpoint Mortgage Servicing, LLC, through payoff communications and account representations, issued a payoff quote dated on or about July 11, 2023, reflecting a payoff amount and payoff effective period.

130.    After the fire loss proceeds were issued to Shellpoint as mortgagee based on payoff information, Shellpoint issued a subsequent payoff quote dated on or about September

[26]

14, 2023, reflecting a payoff amount that did not transparently credit and account for the insurance proceeds in a manner consistent with payoff satisfaction.

131.    The September 2023 payoff representation was materially misleading because it conveyed that Plaintiff remained obligated to pay essentially the full debt notwithstanding Shellpoint's receipt of substantial insurance proceeds tied to payoff satisfaction, and it did so without a transparent accounting showing how those proceeds were applied or why they did not satisfy the payoff-based obligation.

132.    Plaintiff reasonably relied on Shellpoint's payoff and account representations as reflecting the true amount due and was harmed in attempting to prevent foreclosure, evaluating reinstatement and redemption options, and protect his credit.

133.    Plaintiff suffered damages including foreclosure related harm, credit harm, and consequential losses to be proven at trial.

134.    WHEREFORE, Plaintiff requests judgment for compensatory damages, costs, interest, and such other relief as the Court deems just. TOTAL FOR COUNT VII: $400,000 or more.

## COUNT VIII - UNJUST ENRICHMENT

135.    Plaintiff incorporates by reference paragraphs 1 through 109 as if fully set forth herein.

136.    Shellpoint received $304,640.05 in insurance proceeds that were intended to satisfy Plaintiff's mortgage obligation.

137.    Shellpoint failed to apply these proceeds or credit them to Plaintiff's account, resulting in unjust enrichment of Shellpoint by $304,640.05 plus additional amounts through phantom escrow and LPI charges.

138.    Shellpoint's unjust enrichment was unjust under the circumstances because Shellpoint held the funds as agent or mortgagee, not as owner, Shellpoint knew

[27]

the funds were intended for payoff purposes, Shellpoint deliberately withheld application of funds, and Shellpoint initiated foreclosure to recover funds already received.

139.    Plaintiff is entitled to restitution of the $304,640.05 plus all additional amounts wrongfully retained.

140.    WHEREFORE, Plaintiff requests judgment for restitution of $304,640.05, additional unjust enrichment damages of $100,000 or more, attorney fees and costs, and prejudgment and postjudgment interest. TOTAL FOR COUNT VIII: $404,640 or more.

## COUNT IX - WRONGFUL FORECLOSURE

141.    Plaintiff incorporates by reference paragraphs 1 through 114 as if fully set forth herein.

142.    Shellpoint initiated foreclosure proceedings against Plaintiff beginning in December 2023.

143.    The foreclosure was wrong because Shellpoint lacked lawful grounds to foreclose, having received sufficient insurance proceeds in August 2023 to satisfy the entire mortgage obligation.

144.    Shellpoint's failure to apply the $304,640.05 insurance payment to Plaintiff's account, combined with continued charging of phantom escrow insurance and LPI, created an artificial delinquency that served as pretext for foreclosure.

145.    The foreclosure violated the implied covenant of good faith and fair dealing under Michigan law because Shellpoint possessed the means to satisfy the obligation via insurance proceeds, deliberately withheld application of funds, created artificial delinquency through improper charges, and initiated foreclosure based on its own wrongful conduct.

146.        As a result of the wrongful foreclosure, Plaintiff suffered damages including

[28]

loss of property of $340,000 or more, loss of equity, displacement and homelessness lasting more than three years, credit damage, emotional distress, and lost opportunities.WHEREFORE, Plaintiff requests judgment for actual damages of $340,000 or more for property loss, consequential damages of $300,000 or more for displacement, credit, and emotional distress, punitive damages of $200,000 or more for wrongful foreclosure, attorney fees and costs, and prejudgment and post judgment interest. TOTAL FOR COUNT IX: $840,000 or more.

## PRAYER FOR RELIEF

147.    WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor and against Defendants as follows:

148.    Against Shellpoint Mortgage Servicing, LLC, in an amount exceeding Three Million Dollars, including actual damages, treble damages, punitive damages, attorney fees, costs, prejudgment interest, and postjudgment interest.

149.    Against State Auto Property & Casualty Insurance Company, in an amount exceeding Eight Hundred Fifty Thousand Dollars, including actual damages, consequential damages, attorney fees, costs, prejudgment interest, and postjudgment interest.

150.    Against Equifax Information Services LLC, in an amount to be determined at trial for Fair Credit Reporting Act violations.

151.    Declaratory relief that coverage existed under Policy No. 1001110558 for the January 16, 2023, fire loss, that State Auto owed contractual benefits to Plaintiff as the named insured, that the foreclosure was wrongful and violated Michigan law, and that Plaintiff's account should be credited with the $304,640.05 insurance proceeds.

152.    Injunctive relief as necessary to prevent further harm and to preserve Plaintiff's remaining rights.

153.    Treble damages where applicable under MCL 600.2919a.

[29]

154.  Punitive damages for willful, reckless, and bad faith conduct.

155.  Attorney fees and costs as allowed by law under the Fair Credit Reporting Act, Real Estate Settlement Procedures Act, state common law, and applicable Michigan statute.

156.  Prejudgment interest from the date of each violation through judgment.

157.  Post judgment interest as provided by law.

158.  Such other and further relief as the Court deems just and proper.

159.  Plaintiff further requests that this Court award such relief as will fully compensate Plaintiff for the damages sustained and provide appropriate remedies for the violations of federal and state law.

160.  TOTAL DAMAGES SOUGHT: Four Million Nine Hundred Thousand Dollars or more.

## JURY DEMAND

161.  Plaintiff demands trial by jury on all issues so triable pursuant to Federal Rule of Civil Procedure 38.

Respectfully submitted,

Robert M. McAlkich III Pro Se

8698 Community Boulevard Warren, Michigan 48093

Dated: January 30, 2026