**FILED - LN**
April 16, 2026 10:28 AM
CLERK OF COURT
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY: EOD  SCANNED BY: eod 04/15

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**ROBERT M. McALKICH III,**
   Plaintiff,

v.

**SHELLPOINT MORTGAGE SERVICING, LLC**
(f/k/a Newrez LLC d/b/a Shellpoint Mortgage Servicing),

**STATE AUTO PROPERTY & CASUALTY INSURANCE COMPANY**
(a subsidiary or affiliate of Liberty Mutual Insurance Company),

**EQUIFAX INFORMATION SERVICES LLC,**
   Defendants.

Case No. 1:26-cv-468
Hon. Paul L. Maloney

**AMENDED COMPLAINT FOR DAMAGES, DECLARATORY RELIEF, AND JURY DEMAND**

---

Plaintiff Robert M. McAlkich III, proceeding pro se, alleges as follows:

### INTRODUCTION

1. This action arises from:

   a)    a catastrophic fire at Plaintiff's home;

   b)    the issuance of payoff-level insurance proceeds to the mortgage servicer;

   c)    the servicer's failure to provide a transparent accounting of those proceeds,

   d)    materially inaccurate and misleading mortgage credit reporting; and

   e)    foreclosure activity pursued after Defendants had already received payoff-level funds sufficient to satisfy the mortgage obligation.

2. On January 16, 2023, a catastrophic fire damaged or destroyed the dwelling located at 1610 Spencer Road SE, Kalkaska, Michigan 49646. State Auto had issued homeowners Policy No. 1001110558 covering that property, with dwelling coverage of $321,700 and a $1,000 deductible.

3.      At all relevant times, Plaintiff was the borrower on mortgage loan number 9716285110, a USDA Rural Development guaranteed mortgage originally executed in April 2021 and later serviced by Defendant Shellpoint.

4.      On or about August 4, 2023, State Auto issued insurance proceeds in the amount of $304,640.05 payable exclusively to Shellpoint as mortgagee. State Auto's own payoff-based calculation used principal of $296,453.67, interest of $13,810.76, and payoff math tied to August 11, 2023.

5.      Despite the insurance-payment event, Shellpoint continued to behave as though the debt remained due. It issued a higher payoff quote, pursued loss-mitigation and deed-in-lieu options, engaged in foreclosure-prevention communications, and ultimately moved forward with foreclosure.

6.      External loan history reflects that on February 23, 2024, it posted a "Loss Draft Payment" credit of $304,640.05 to the account. The same ledger page reflects additional entries posted that day, including: a "Foreclosure (Cash)" amount of $314,608.67; a "Liquidation Proceeds Payment" of $4,414.71; an "Escrow Only Payment" of $9,173.71; and a "USDA Rural Housing Disbursement" credit of $835.30.

7.      The simultaneous appearance of these foreclosure-related charges alongside the loss-draft credit indicates that Shellpoint did not transparently credit the insurance proceeds until after charging fees and expenses associated with foreclosure.

8.      USDA records further confirm that USDA did not pay Shellpoint on any claim, reflected the unpaid principal balance as $296,453.67, and tied the delinquency to the fire-loss event rather than to an ordinary repayment default. Those records support the reasonable inference

that Shellpoint was not awaiting USDA reimbursement as a basis for continued default, foreclosure, or negative credit reporting.

9.    Equifax reported and maintained materially inaccurate and misleading information concerning the Shellpoint mortgage tradeline, including contradictory combinations of severe delinquency, foreclosure-related coding, and reporting of a $0-balance, and also generated a mixed-file disclosure packet associated with Plaintiff's dispute that included another consumer's name, Andrea F. Dimarco, at Plaintiff's address.

10.    As a direct and proximate result of Defendants' conduct, Plaintiff has suffered loss of property and equity, loss of the use and benefit of payoff-level insurance proceeds, credit harm, emotional distress, displacement, loss of opportunities, and other actual and consequential damages.

11.    Plaintiff's claims are based not on labels or speculation, but on specific documentary facts, including payoff figures, the amount and timing of the mortgagee insurance payment, Shellpoint's later internal ledger entries, USDA records reflecting no lender claim payment, and Equifax's own mixed-file disclosure materials.

12.    Taken together, those facts plausibly support the inference that:

a)    payoff-level or near-payoff-level proceeds were transmitted to Shellpoint;

b)    Shellpoint did not contemporaneously and transparently apply or account for those proceeds before continuing foreclosure-related conduct and adverse reporting; and

c)    Equifax failed to employ reasonable procedures and failed to conduct a reasonable reinvestigation after Plaintiff's disputes.

## PARTIES

13.    Plaintiff Robert M. McAlkich III is an individual residing in Warren, Michigan, and was the owner and borrower associated with the property and mortgage loan at issue.

14.    Defendant Shellpoint Mortgage Servicing, LLC, formerly known as Newrez LLC doing business as Shellpoint Mortgage Servicing, is a mortgage servicer and furnisher of information to consumer reporting agencies that serviced Plaintiff's loan.

15.    Defendant State Auto Property & Casualty Insurance Company issued the homeowners insurance policy covering the subject property and handled the claim through its own personnel and/or agents.

16.    Defendant Equifax Information Services LLC is a consumer reporting agency within the meaning of the Fair Credit Reporting Act, 15 U.S.C. § 1681a(f).

## JURISDICTION AND VENUE

17.    This Court has jurisdiction under 28 U.S.C. § 1331 because Plaintiff asserts claims under the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq., and the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601 et seq.

18.    This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's related state-law claims because they arise from the same nucleus of operative facts.

19.    Venue is proper in this Court because the property is located in this district, and a substantial part of the events or omissions giving rise to the claims occurred here.

## FACTUAL ALLEGATIONS
### A. THE MORTGAGE LOAN AND INSURANCE POLICY

20.    Plaintiff's mortgage loan was originated in April 2021. The mortgage documents identify the property as 1610 Spencer Rd SE, Kalkaska, Michigan 49646, and the USDA rider required occupancy as Plaintiff's principal residence.

21.    State Auto's homeowners renewal declaration identified Policy No. 1001110558, policy period March 26, 2022 to March 26, 2023, dwelling coverage of $321,700, and a $1,000

deductible. The declaration further stated that the premium would be billed to and paid by the mortgagee.

## B. THE FIRE AND STATE AUTO'S CLAIM HANDLING

22.     On January 16, 2023, a fire occurred at the property. A fire-investigation affidavit and administrative search warrant reflect the date and location of the fire and the official investigation into its cause and origin.

23.     On January 31, 2023, State Auto sent Plaintiff a reservation-of-rights letter raising questions concerning cause of fire, use/occupancy, and procurement-related issues, while expressly stating that the letter was not itself a denial and that State Auto was continuing its investigation.

24.     On March 9, 2023, State Auto sent a request for sworn statement in proof of loss and additional documents, enclosing proof-of-loss forms and requiring a response within 60 days.

25.     Public adjuster Globe Midwest Adjusters withdrew representation on February 28, 2023 and advised Plaintiff that the claim had become a coverage issue rather than simply a damage issue.

26.     On July 18, 2023, State Auto denied Plaintiff's direct claim based on alleged noncooperation and failure to provide requested proof-of-loss materials and documents.

27.     At the same time, State Auto proceeded on the mortgagee payment path rather than extinguishing the matter altogether.

## C. SHELLPOINT'S JULY AND SEPTEMBER 2023 PAYOFF QUOTES

28.     On July 11, 2023, Shellpoint issued a payoff quote effective through August 11, 2023 showing principal balance of $296,453.67, interest to August 11, 2023 of $13,810.76, fees of $432.34, funds owed by borrower of $4,678.86, funds owed to borrower of ($841.30), and a total payoff of $314,534.33.

29.     State Auto's later payoff math used the same principal and interest figures in calculating the mortgagee payment.

30.     On September 14, 2023, after the insurance-payment event, Shellpoint issued a new payoff quote effective through September 30, 2023 showing principal balance still at $296,453.67, interest of $14,914.50, fees of $1,865.13, funds owed by borrower of $7,269.43, funds owed to borrower of ($841.30), and a total payoff of $319,661.43.

31.     That September 2023 payoff quote was higher than the July 2023 quote despite the intervening mortgagee insurance payment.

32.     The September 2023 quote also continued to list the next payment due date as 1/1/2022, reinforcing Plaintiff's contention that Shellpoint continued treating the loan as chronically delinquent despite the insurance event.

### D. STATE AUTO'S MORTGAGEE PAYMENT

33.     State Auto's claim materials, as summarized in the USDA production and the filed complaint, reflect that State Auto issued $304,640.05 to Shellpoint on or about August 4, 2023.

34.     That payment was based on principal of $296,453.67, interest of $13,810.76, payoff of $310,264.43 as of August 11, 2023, a per diem reduction of $4,624.38, and a deductible of $1,000.00.

35.     Those figures establish that State Auto issued payoff-level insurance proceeds tied directly to Plaintiff's mortgage obligation.

36.     Plaintiff was not made a co-payee on the mortgagee payment and did not receive direct control over those funds.

## E. SHELLPOINT'S POST-PAYMENT CONDUCT

37.     After the insurance-payment event, Shellpoint continued to communicate with Plaintiff as though the loan were still in an unresolved delinquency, foreclosure-prevention, and loss-draft status.

38.     On October 17, 2023, and again in November 2023, Shellpoint sent "complex matter, need more time" responses indicating it was still gathering requested information and had not resolved Plaintiff's inquiries.

39.     On October 18, 2023, Shellpoint sent an "Insurance Claim Procedures" packet stating that for larger losses the funds would be placed in a restricted escrow account and repairs would be monitored for draws, while also requiring a claim check, adjuster's report, contractor proposal, owner's affidavit, and loss-draft forms.

40.     On November 6, 2023, Shellpoint's SPOC sent a deed-in-lieu and loss-mitigation document request packet seeking hardship and financial documents.

41.     On November 28, 2023, Shellpoint invited Plaintiff to a foreclosure-prevention outreach event offering deferment, loan modification, repayment plan, reinstatement, or transition options.

42.     On December 5, 2023, Shellpoint sent a "missing documents" letter stating it had received the insurance claim information but could not proceed without, among other things, an adjuster's report, signed contractor proposal, W-9, and a USDA owner's affidavit.

43.     These communications support the reasonable inference that, after receipt of the mortgagee insurance proceeds, Shellpoint simultaneously treated the loan account as:

        a)      a restricted-escrow rebuild claim;

        b)      a loss-mitigation or deed-in-lieu matter; and

c)    a foreclosure matter, without providing Plaintiff a timely, coherent, and transparent accounting showing how payoff-level proceeds had been received, posted, allocated, or exhausted

44.    Shellpoint's own loan-history summary shows that on February 23, 2024, it entered a "Loss Draft Payment" of ($304,640.05).

45.    The same February 23, 2024 internal ledger page also reflects the following entries: "Unapplied Payment" ($841.30); "Liquidation Proceeds Pmt" $4,414.71; "Escrow Only Payment" $9,173.71; "Foreclosure (Cash)" $314,608.67; "FC Costs Pmt" $1,441.76; "Appraisal Pmt" $1,125.00; "Attorney Cost Pmt" $37.50; "Property Inspection Pmt" $180.00; and "USDA Rural Housing Disb" ($835.30).

46.    The presence of those entries on the same date plausibly supports the inference that Shellpoint internally recognized and posted the loss-draft proceeds only after foreclosure-related charges and transactions had already advanced.

47.    At the pleading stage, those records permit the reasonable inference that Shellpoint did not contemporaneously and transparently credit the insurance proceeds before pursuing foreclosure-related activity, assessing related charges, and continuing delinquency-based treatment of the account.

48.    The same loan-history sequence also shows lender-placed hazard charges, property inspection charges, title costs, foreclosure costs, and TransUnion-related skip-trace or client-auth expenses in the months around the foreclosure. These records further support the inference that Shellpoint failed to reconcile payoff-level proceeds before continuing foreclosure-related activity and debt-collection communications.

## G. EQUIFAX REPORTING AND MIXED FILE

49.    In December 2025, Equifax issued a disclosure packet bearing Confirmation No.5340574595. The mailing materials and envelope associated with that packet were addressed to Andrea F. Dimarco at Plaintiff's address, while the report itself was prepared for Robert McAlkich III.

50.    That commingling of consumer identifiers is consistent with a mixed-file or file integrity problem and undermines the reliability of Equifax's procedures and reinvestigation.

51.    Plaintiff disputed both the mortgage tradeline inaccuracies and the file-integrity issues through Equifax.

52.    Despite those disputes, Equifax failed to correct the contradictory and misleading Shellpoint tradeline and failed to conduct a reasonable reinvestigation targeted to the documentary evidence and mixed-file indicators.

53.    Shellpoint expressly acknowledged receipt of Plaintiff's correspondence on multiple occasions, including but not limited to letters dated October 17, 2023, November 10, 2023, and subsequent correspondence in 2024.

54.    In those responses, Shellpoint repeatedly stated that it was "working to gather the requested information" or that the matter was "complex" and required additional time, but it did not provide a substantive accounting of the insurance proceeds or a clear explanation of the loan status.

55.    Shellpoint's repeated acknowledgments of Plaintiff's inquiries, coupled with its failure to provide a timely and complete substantive response, support the reasonable inference that Shellpoint failed to conduct a reasonable investigation and failed to provide the information required to explain the application and disposition of payoff-level insurance proceeds.

## H. SHELLPOINT AS FURNISHER

56.     Shellpoint furnished information concerning Plaintiff's mortgage account to one or more consumer reporting agencies, including Equifax.

57.     On information and belief, Equifax and/or other consumer reporting agencies transmitted Plaintiff's dispute information to Shellpoint through the CRA-furnisher process.

58.     Plaintiff alleges that Shellpoint continued to furnish and/or verify materially inaccurate and misleading information concerning delinquency, foreclosure status, balance, and historical account treatment despite documentary evidence inconsistent with that reporting.

## I. TROTT'S DEBT-COLLECTION COMMUNICATIONS

59.     On July 19, 2023, Trott Law, P.C. sent Plaintiff a written debt-collection notice stating that Trott was "a debt collector," that it was "trying to collect a debt" owed to NewRez LLC d/b/a Shellpoint Mortgage Servicing, that the account number was 9716285110, and that the "total amount of the debt now" was $314,020.51. The notice further advised Plaintiff that he could dispute the debt by August 26, 2023 and requested that he review the enclosed periodic statement for an itemization of the debt.

60.     On August 3, 2023, Trott sent Plaintiff a foreclosure-publication notice stating that the amount claimed due on the mortgage as of the date of notice was $314,355.61 and that the mortgage would be foreclosed by advertisement with a sale scheduled for September 21, 2023. Trott again stated that the notice was from a debt collector.

61.     On December 11, 2023, Trott sent Plaintiff another written debt-collection notice stating that Trott was trying to collect a debt owed to NewRez, LLC d/b/a Shellpoint Mortgage Servicing and that the "total amount of the debt now" was $321,931.24. The notice again advised Plaintiff of a right to dispute the debt and request the name and address of the original creditor.

62.     On December 29, 2023, Trott sent Plaintiff another publication notice pursuant to MCL 600.3208, again in connection with foreclosure activity on the same mortgage loan.

63.     These Trott communications occurred after the August 2023 insurance-payment event described above and reflected debt amounts and collection activity that, on information and belief, had not been transparently reconciled with the payoff-level mortgagee insurance proceeds previously issued to Shellpoint.

## COUNT I CONVERSION / STATUTORY CONVERSION (Against Shellpoint)

64.     Plaintiff incorporates the preceding paragraphs.

65.     The $304,640.05 insurance payment constituted specific, identifiable funds traceable to a single fire-loss claim and to Plaintiff's mortgage obligation.

66.     Shellpoint obtained possession of, or dominion over, those specific funds through its position as mortgagee and servicer.

67.     Once Shellpoint received those specifically identifiable proceeds, it had a duty to apply, credit, hold, or account for them in a manner consistent with the governing loan relationship, the purpose for which the funds were issued, and Plaintiff's corresponding interest in the reduction or satisfaction of the mortgage debt and in any surplus or excess.

68.     Plaintiff alleges that Shellpoint exercised dominion over those identifiable proceeds in a manner inconsistent with Plaintiff's rights by failing to contemporaneously and transparently credit or account for them, by continuing to treat the account as delinquent, by issuing a higher payoff quote after the payment event, and by internally posting the loss-draft payment only later, on February 23, 2024, after foreclosure-related activity had already advanced.

69.     These allegations plausibly state a claim for common-law conversion under Michigan law because they identify the specific funds at issue, Shellpoint's control over those funds, and conduct inconsistent with Plaintiff's rights.

70.    For the same reasons, and to the extent discovery shows concealment, wrongful retention, or knowing misuse of proceeds in which Plaintiff retained a property interest, Plaintiff states a claim for statutory conversion under MCL 600.2919a.

## COUNT II FAIR CREDIT REPORTING ACT 15 U.S.C. §§ 1681e(b) AND 1681i(a)
### *(Against Equifax)*

71.    Plaintiff incorporates the preceding paragraphs.

72.    Equifax reported materially inaccurate and/or materially misleading information concerning the Shellpoint tradeline, including severe delinquency and foreclosure-related coding while simultaneously showing a $0 balance.

73.    Equifax also failed to follow reasonable procedures, generated a disclosure packet in which another consumer's name, Andrea F. Dimarco, appeared on the mailing materials associated with Plaintiff's dispute, while the report itself was for Plaintiff. These facts plausibly show a file-matching or file-integrity failure.

74.    These allegations support the inference that Equifax failed to follow reasonable procedures to assure maximum possible accuracy, as required by 15 U.S.C. § 1681e(b).

75.    Plaintiff further alleges that he disputed both the tradeline inaccuracies and the mixed-file problem, thereby triggering Equifax's duties to conduct a reasonable reinvestigation and to notify the furnisher under 15 U.S.C. § 1681i(a).

76.    Nevertheless, Equifax failed to resolve the contradictions or correct the mixed-file indicators.

77.    At the pleading stage, these facts plausibly state violations of both §§ 1681e(b) and 1681i(a).

78.    Equifax's conduct was at least negligent and, in light of the facial contradictions and mixed-file indicators, plausibly reckless or willful.

## COUNT III FAIR CREDIT REPORTING ACT 15 U.S.C. § 1681s-2(b)
### (Against Shellpoint)

79.    Plaintiff incorporates the preceding paragraphs.

80.    Plaintiff disputed the accuracy and completeness of Shellpoint's reporting concerning delinquency, foreclosure status, balance, and historical account treatment through one or more consumer reporting agencies.

81.    On information and belief, the consumer reporting agency or agencies transmitted notice of those disputes to Shellpoint as required by 15 U.S.C. § 1681i(a)(2).

82.    Upon receiving such notice, Shellpoint was required to conduct a reasonable investigation, review all relevant information provided by the agency, report the results to the agency, and modify or delete information that was inaccurate, incomplete, or unverifiable.

83.    Plaintiff plausibly alleges that Shellpoint failed to conduct a reasonable investigation and instead continued to furnish and verify information that was inaccurate and materially misleading, including delinquency and foreclosure coding that did not reasonably account for the August 2023 payoff-level insurance payment and the February 23, 2024 posting sequence.

84.    These facts plausibly state a claim under § 1681s-2(b), and Shellpoint's conduct was negligent and plausibly reckless or willful.

85.    Shellpoint's own correspondence eventually reflected a $0 principal balance in December 2024, contradicting its earlier payoff quotes and supporting the inference that the debt and default status were not accurately determined.

## COUNT IV REAL ESTATE SETTLEMENT PROCEDURES ACT / SERVICING
### ACCOUNTING FAILURES (Against Shellpoint)

86.    Plaintiff incorporates the preceding paragraphs.

87.    Shellpoint was the servicer of Plaintiff's mortgage and was subject to RESPA, 12 U.S.C. § 2605, and its implementing Regulation X.

88.    Between August 2023 and November 2023, Plaintiff sent multiple written communications to Shellpoint requesting information about when the $304,640.05 insurance proceeds were received, when and how those proceeds were posted and allocated, the basis for any alleged remaining indebtedness, and how Shellpoint reconciled those proceeds with charges for foreclosure, escrow, and related fees.

89.    Shellpoint acknowledged receipt of Plaintiff's communications, including letters dated October 17, 2023, and November 10, 2023, and stated that the matter was complex and that it was still gathering information. These acknowledgments did not provide the substantive information requested.

90.    Shellpoint sent additional correspondence and packages requiring adjuster reports, contractor proposals, W-9 forms, and USDA affidavits, but it did not provide a timely and clear accounting of the insurance proceeds or the true loan balance.

91.    To the extent that Plaintiff's written communications constituted qualified written requests or notices of error under RESPA, Shellpoint was required to provide written acknowledgment within five business days and to correct or explain the account within thirty business days.

92.    Shellpoint failed to comply with these duties, instead repeatedly acknowledging the communications without providing the requested information.

93.    As a result of Shellpoint's RESPA violations, Plaintiff was deprived of material servicing information, was unable to verify the loan balance or status, and suffered actual damages including loss of property, added fees, credit harm, and emotional distress.

94. The pattern of non-responses and incomplete responses supports an inference of a pattern or practice of noncompliance.

95. Plaintiff therefore seeks actual damages, statutory damages to the extent available, costs, attorney's fees, and all other relief under RESPA.

## COUNT V WRONGFUL FORECLOSURE / FORECLOSURE BASED ON IMPROPER ACCOUNTING (Against Shellpoint)

96. Plaintiff incorporates the preceding paragraphs.

97. Shellpoint initiated and advanced foreclosure proceedings after receiving payoff level insurance proceeds, while failing to reconcile those proceeds with the claimed default and payoff amounts.

98. Pursuing foreclosure based on a debt picture that had not been transparently reconciled constitutes a fraud or irregularity in the foreclosure process under Michigan law because the foreclosure was premised on inaccurate or materially inflated balances.

99. Plaintiff was prejudiced because, absent the fraud or irregularity, he would have been in a better position to preserve his property interest, challenge the claimed default, contest the amount allegedly due, and protect his equity.

100. Shellpoint's own records, including the February 23, 2024 posting sequence and later correspondence showing a zero balance, support the inference that the loan should not have been declared in default or foreclosed.

101. As a direct result, Plaintiff suffered loss of property, loss of equity, added fees, and consequential damages, and seeks all relief available under Michigan law for wrongful foreclosure.

## COUNT VI DECLARATORY RELIEF (Against State Auto)

102. Plaintiff incorporates the preceding paragraphs.

103. State Auto issued homeowners Policy No. 1001110558 covering the subject property.

104.    A covered fire loss occurred on January 16, 2023.

105.    State Auto processed the mortgagee side of the claim and issued $304,640.05 based on payoff-related figures tied directly to Plaintiff's mortgage obligation.

106.    State Auto structured that payment exclusively to Shellpoint, without making Plaintiff a co-payee and without providing Plaintiff direct control over, or a transparent mechanism to verify the application of, proceeds calculated by reference to Plaintiff's mortgage debt.

107.    An actual controversy exists concerning the legal effect, disposition, and application of those payoff-level insurance proceeds, including whether they materially satisfied or reduced the mortgage obligation and whether Plaintiff retains the right to challenge their treatment.

108.    Plaintiff therefore seeks declaratory relief establishing that the $304,640.05 constituted payoff-level insurance proceeds tied to Plaintiff's mortgage obligation and clarifying Plaintiff's right to challenge the disposition and application of those proceeds.

## COUNT VII UNJUST ENRICHMENT / MONEY HAD AND RECEIVED
### (Against Shellpoint, in the Alternative)

109.    Plaintiff incorporates the preceding paragraphs.

110.    In the alternative to Plaintiff's tort and statutory theories, Shellpoint received and retained a substantial benefit in the form of the $304,640.05 insurance proceeds and related account benefits.

111.    If Shellpoint contends that no conversion or other wrongful dominion occurred, then, in the alternative, its retention of that benefit without a full accounting and lawful explanation for its receipt, posting, allocation, and effect on the debt would be inequitable.

## COUNT VIII BREACH OF CONTRACT
### (Against Shellpoint)

112.    Plaintiff incorporates the preceding paragraphs as though fully set forth herein.

113.    Plaintiff's mortgage loan and related loan documents constituted a valid and enforceable contract between Plaintiff and the lender and/or its servicer, including Shellpoint as the entity servicing and administering the loan at the relevant times.

114.    Under that contractual relationship, and under the duties inherent in servicing and administering the loan account, Shellpoint was required to apply, credit, hold, and account for funds received in connection with the mortgage debt in a manner consistent with the loan documents, the purpose for which such funds were paid, and Plaintiff's rights in the reduction or satisfaction of the mortgage obligation.

115.    State Auto issued payoff-level mortgagee insurance proceeds in the amount of $304,640.05 tied directly to Plaintiff's mortgage obligation, using payoff figures based on principal of $296,453.67 and interest of $13,810.76.

116.    Despite that payment event, Shellpoint continued to treat the loan as delinquent, issued a higher payoff quote in September 2023, continued foreclosure-prevention and loss-mitigation communications, and failed to provide Plaintiff with a timely, coherent, and transparent accounting showing how the proceeds were received, posted, allocated, or exhausted.

117.    Shellpoint's own loan-history records later showed that on February 23, 2024 it posted a "Loss Draft Payment" of $304,640.05, while the same posting sequence also reflected foreclosure-related entries including "Foreclosure (Cash)" of $314,608.67, "Liquidation Proceeds Pmt" of $4,414.71, "Escrow Only Payment" of $9,173.71, "FC Costs Pmt" of $1,441.76, "Appraisal Pmt" of $1,125.00, "Attorney Cost Pmt" of $37.50, "Property Inspection Pmt" of $180.00, and "USDA Rural Housing Disb" of $835.30.

118.    These facts plausibly support the inference that Shellpoint breached the contractual duties governing the loan by failing to timely and properly apply or account for payoff-level

proceeds, by continuing to impose or recognize charges and foreclosure-related activity without first reconciling the payment, and by continuing to treat the account as in unresolved default despite documentary facts materially inconsistent with that treatment.

119. Shellpoint further breached the contractual relationship by failing to provide accurate payoff and balance information after the insurance-payment event, including issuing a September 14, 2023 payoff quote that was higher than the July 11, 2023 payoff quote despite the intervening payoff-level payment.

120. As a direct and proximate result of Shellpoint's breaches, Plaintiff suffered actual damages, including but not limited to loss of property and equity, costs associated with foreclosure and redemption, loss of the use and benefit of insurance proceeds, credit harm, consequential financial losses, emotional distress, and other damages to be proven at trial.

121. Plaintiff therefore seeks all damages and relief available for breach of contract under Michigan law, together with interest, costs, and all further relief the Court deems just and proper.

## **PRAYER FOR RELIEF**

122. Against Equifax and Shellpoint, for statutory and actual damages under the Fair Credit Reporting Act, including punitive damages if warranted, plus costs and attorney's fees.

123. Against Shellpoint, for actual damages, statutory damages, and attorney's fees under the Real Estate Settlement Procedures Act; for damages and equitable relief under Michigan law for wrongful foreclosure, breach of contract, conversion, and unjust enrichment; and for injunctive and equitable relief requiring a full and accurate accounting of the insurance proceeds and loan status.

124. Against State Auto, for declaratory relief establishing that the $304,640.05 constituted payoff-level insurance proceeds tied to Plaintiff's mortgage obligation and clarifying

Plaintiff's right to challenge the disposition of those proceeds; and for costs and any further relief deemed just and proper.

125.    For trial by jury on all issues so triable.

126.    For pre-judgment and post-judgment interest.

127.    For such other and further relief as the Court deems just and proper.

## JURY DEMAND

128.    Plaintiff demands trial by jury on all issues so triable.

Robert M. McAlkich III, Pro Se
8698 Community Boulevard
Warren, Michigan 48093
231-413-8458
Mcalkich9716285110@gmail.com

usps.com
$10.30
**US POSTAGE**

9405 5301 0935 5286 0164 33 0103 0001 0004 8933

**U.S. POSTAGE PAID**
Click-N-Ship®



02/13/2026
1 lb 0 oz

Mailed from 48093   693693954362285

# PRIORITY MAIL®

ROBERT MCALKICH
8698 COMMUNITY BLVD
WARREN MI 48093-6707

Created 2026-02-13
Flat Rate Envelope
RDC 03

C002



WESTERN DISTRICT OF MICHIGAN
CLERK OF COURT UNITED STATES, DISTRICT (
315 W ALLEGAN ST
LANSING MI 48933-1500

## USPS TRACKING #



9405 5301 0935 5286 0164 33

CASE # 1:26-CV-468

JUDGE PAUL L. MALONEY