**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| **ROBERT M. McALKICH III,**<br>Plaintiff,<br><br>v.<br><br>**NEWREZ LLC d/b/a SHELLPOINT MORTGAGE SERVICING,**<br>**STATE AUTO PROPERTY AND CASUALTY INSURANCE COMPANY,**<br>**EQUIFAX INFORMATION SERVICES LLC,**<br>**STERLING CLAIMS MANAGEMENT, INC.,**<br>**TRANS UNION LLC,** and<br>**EXPERIAN INFORMATION SOLUTIONS, INC.,**<br>Defendants. | Case No. 1:26-cv-00468-PLM-RSK<br>Hon. Paul L. Maloney<br>Magistrate Judge Ray Kent<br><br>**EXHIBIT A PROPOSED SECOND AMENDED COMPLAINT AND JURY DEMAND** |

---

**Plaintiff:**
**ROBERT M. McALKICH III**
8698 Community Blvd.
Warren, Michigan 48093

**STATE AUTO PROPERTY AND CASUALTY INSURANCE COMPANY**
c/o CSC-Lawyers Incorporating Service (Company)
3410 Belle Chase Way, Suite 600
Lansing, Michigan 48911

**STERLING CLAIMS MANAGEMENT, INC.**
c/o CSC-Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, California 95833

**EXPERIAN INFORMATION SOLUTIONS, INC.**
c/o The Corporation Company
40600 Ann Arbor Road E, Suite 201
Plymouth, Michigan 48170

**NEWREZ LLC d/b/a SHELLPOINT MORTGAGE SERVICING**
c/o CSC-Lawyers Incorporating Service (Company)
3410 Belle Chase Way, Suite 600
Lansing, Michigan 48911

**EQUIFAX INFORMATION SERVICES LLC**
c/o CSC-Lawyers Incorporating Service (Company)
3410 Belle Chase Way, Suite 600
Lansing, Michigan 48911

**TRANS UNION LLC**
c/o CSC-Lawyers Incorporating Service (Company)
3410 Belle Chase Way, Suite 600
Lansing, Michigan 48911

Plaintiff Robert M. McAlkich III, appearing pro se, files this Proposed Second Amended Complaint against Defendants NewRez LLC d/b/a Shellpoint Mortgage Servicing, State Auto Property and Casualty Insurance Company, Equifax Information Services LLC, Sterling Claims Management, Inc., Trans Union LLC, and Experian Information Solutions, Inc., and alleges as follows:

## I. INTRODUCTION

1. This action arises from a January 16, 2023 fire loss at Plaintiff's home at 1610 Spencer Road SE, Kalkaska, Michigan; State Auto homeowner's policy number 1001110558; mortgage loan number 9716285110; State Auto's $304,640.05 dwelling-loss mortgagee payment to or for the benefit of Shellpoint/NewRez; Shellpoint/NewRez's accounting, payoff, foreclosure, escrow, lender-placed-insurance, USDA, and credit-reporting conduct; and the later consumer-reporting and reinvestigation conduct of Equifax, Trans Union, and Experian.

2. The central factual issue is not a minor posting dispute. The case concerns a specific, identifiable $304,640.05 insurance-loss payment, check number 1001366503, issued through the mortgagee claim path after a severe dwelling fire, followed by foreclosure, delayed accounting, disputed liquidation accounting, and continuing derogatory mortgage credit reporting.

3. After the payment event, Shellpoint/NewRez did not provide Plaintiff with a clear, timely, intelligible accounting showing that the payment satisfied the loan, reduced the loan, was held in restricted escrow, was reversed, was unapplied, was transferred to an investor,

2

or was otherwise handled in accordance with the Note, Mortgage, loss-draft procedures, investor rules, USDA rules, or federal servicing law.

4. Instead, Shellpoint/NewRez continued to generate or rely on payoff figures, accelerated balances, foreclosure figures, reinstatement figures, escrow figures, lender-placed-insurance figures, foreclosure-cost figures, and credit-reporting data that did not reconcile the $304,640.05 insurance-payment event or the persistent $841.30 unapplied-funds balance.

5. Plaintiff uses the phrase artificial default to describe an asserted default, acceleration, foreclosure posture, and credit-reporting history that existed on paper only because Shellpoint/NewRez failed to timely credit, apply, restrict, reconcile, release, or explain the $304,640.05 insurance-loss payment and related account-credit effect before foreclosure activity continued.

6. Shellpoint/NewRez's later loan history reflected a $304,640.05 Loss Draft Payment and a $314,608.67 Foreclosure (Cash) transaction on or about February 23, 2024, along with entries relating to principal, interest, escrow, unapplied funds, foreclosure costs, attorney costs, appraisal costs, property inspections, USDA rural housing disbursements, and other account activity.

7. State Auto, USDA, Sterling, and Shellpoint/NewRez each directed Plaintiff toward the others or toward the servicer for missing information. That circular referral delayed Plaintiff's ability to discover how the insurance proceeds were calculated, paid, routed, held, posted, applied, reported, and reconciled.

8. Equifax, Trans Union, and Experian maintained, reinvestigated, verified, updated, or continued reporting the Shellpoint/NewRez mortgage tradeline after Plaintiff disputed the completeness and accuracy of that reporting.

9. Defendants' conduct caused foreclosure-related damages, redemption-related damages, loss-draft and accounting damages, insurance-benefit damages, escrow and lender-placed-insurance damages, credit-reporting damages, employment-related harm, loss of credit opportunities, out-of-pocket costs, emotional distress where recoverable, loss of time, and other actual damages.

10. Plaintiff seeks actual damages, statutory damages where available, punitive damages where available, treble damages where available, declaratory relief, an accounting, correction of inaccurate or misleading credit reporting, interest, costs, and all other relief permitted by law.

## II. PARTIES

11. Plaintiff Robert M. McAlkich III is a natural person and consumer. Plaintiff's mailing address is 8698 Community Boulevard, Warren, Michigan 48093. Plaintiff was the borrower on loan number 9716285110, owner of the property located at 1610 Spencer Road SE, Kalkaska, Michigan, and named insured under State Auto policy number 1001110558.

12. Defendant NewRez LLC d/b/a Shellpoint Mortgage Servicing is a mortgage servicer, mortgage owner or owner-affiliated entity, and/or loan-servicing entity that serviced or controlled Plaintiff's mortgage loan, issued payoff quotes, handled insurance-loss-draft and escrow activity, caused or controlled foreclosure activity, and furnished mortgage tradeline information to consumer reporting agencies.

13. NewRez LLC d/b/a Shellpoint Mortgage Servicing was previously named in this action as Shellpoint Mortgage Servicing, LLC. Plaintiff intends this amendment to correct and clarify the caption and defendant name. The intended defendant is the NewRez/Shellpoint entity that serviced, owned, controlled, collected, foreclosed, or reported the mortgage loan at issue.

4

14. Defendant State Auto Property and Casualty Insurance Company issued or underwrote Plaintiff's homeowner's policy number 1001110558 covering the property located at 1610 Spencer Road SE, Kalkaska, Michigan, and handled the fire-loss claim assigned claim number PR-0000000-467718.

15. Defendant Equifax Information Services LLC is a consumer reporting agency that maintained, reported, reinvestigated, verified, or continued publishing credit information concerning Plaintiff, including the Shellpoint/NewRez mortgage tradeline.

16. Defendant Sterling Claims Management, Inc. is a claims-management company that participated in the mortgagee insurance-claim process involving Plaintiff's property, State Auto policy number 1001110558, State Auto claim number PR-0000000-467718, loan number 9716285110, and the $304,640.05 mortgagee insurance payment.

17. Defendant Trans Union LLC is a consumer reporting agency that maintained, reported, reinvestigated, verified, or continued publishing credit information concerning Plaintiff, including the Shellpoint/NewRez mortgage tradeline.

18. Defendant Experian Information Solutions, Inc. is a consumer reporting agency that maintained, reported, reinvestigated, verified, or continued publishing credit information concerning Plaintiff, including the Shellpoint/NewRez or NR/SMS/CAL mortgage tradeline.

### III. JURISDICTION AND VENUE

19. This Court has federal-question jurisdiction under 28 U.S.C. Section 1331 because this action includes claims arising under federal statutes, including the Real Estate Settlement Procedures Act, 12 U.S.C. Section 2605 and Regulation X, 12 C.F.R. Part 1024; the Fair Debt Collection Practices Act, 15 U.S.C. Section 1692 et seq.; and the Fair Credit Reporting Act, 15 U.S.C. Section 1681 et seq.

20.    This Court has supplemental jurisdiction over Plaintiff's related state-law claims under 28 U.S.C. Section 1367 because those claims arise from the same case or controversy as Plaintiff's federal claims.

## IV. FACTUAL ALLEGATIONS

### A. THE MORTGAGE AGREEMENT AND PRE-FIRE HISTORY

21.    Before and during the fire-loss period, Shellpoint/NewRez records reflected a servicing transfer effective November 2, 2022, and Shellpoint's January 26, 2023 forbearance approval beginning January 1, 2023, and ending March 30, 2023. Plaintiff alleges Shellpoint/NewRez failed to reconcile that transfer and forbearance posture before treating the loan as continuously delinquent, foreclosable, and credit-reportable. **(See Ex. C, EX-005, McALKICH--000021 to McALKICH--000026; Ex. C, EX-012, McALKICH--000027 to McALKICH--000030.)**

22.    The USDA Rural Loan Occupancy Rider, dated April 14, 2021, stated that Plaintiff was required to occupy, establish, and use the property as his principal residence and continue occupying the property as his principal residence until payment of all sums secured by the Security Instrument, unless the lender otherwise agreed in writing. **(See Ex. C, EX-004, McALKICH--000019 to McALKICH--000020.)**

23.    The USDA rider matters because the fire destroyed or severely damaged the residence that Plaintiff was required to occupy as his principal residence, and because Defendants' handling of insurance proceeds, occupancy facts, loss mitigation, foreclosure, and USDA claim activity affected Plaintiff's housing, title, loan, and credit rights.

24.    State Auto later asserted cooperation, proof-of-loss, notice, and similar coverage issues in its July 18, 2023 coverage determination and denial materials. **(See Ex. C, EX-035, McALKICH--000042 to McALKICH--000049.)**

25.    State Auto policy number 1001110558 covered the insured location at 1610 Spencer Road SE, Kalkaska, Michigan during the March 26, 2022 through March 26, 2023 policy period. **(See Ex. C, EX-029, McALKICH--000031 to McALKICH--000041.)**

26.    The State Auto renewal declarations reflected dwelling coverage of approximately $321,700, other-structures coverage, personal-property coverage, loss-of-use coverage, personal liability coverage, and medical payments coverage. **(See Ex. C, EX-029, McALKICH--000031 to McALKICH--000041.)**

**B. THE JANUARY 2023 FIRE LOSS AND STATE AUTO INSURANCE PAYMENT**

27.    On or about January 16, 2023, the property sustained a severe fire loss. Plaintiff reported the loss to State Auto, and State Auto assigned claim number PR-0000000-467718.

28.    State Auto's July 18, 2023 coverage-determination materials identified the fire loss at 1610 Spencer Road SE, Kalkaska, Michigan, with a date of loss of January 16, 2023. **(See Ex. C, EX-035, McALKICH--000042 to McALKICH--000049.)**

29.    Plaintiff alleges that State Auto's policy included coverages potentially applicable to debris removal, reasonable repairs, other structures, personal property, loss of use, and related additional coverages, but State Auto did not pay Plaintiff benefits needed to address cleanup, debris, blight, loss of use, or related property damage even though the same claim generated a $304,640.05 mortgagee payment.

30.    Sterling participated in the mortgagee-claim and payment-routing process through communications or records identifying Shellpoint/NewRez as client or servicer, loan number

7

9716285110, State Auto policy number 1001110558, and payment-routing or mortgagee-claim activity. **(See Ex. C, EX-036, McALKICH--000050 to McALKICH--000053.)**

31.    Shellpoint/NewRez account statements, payoff quotes, State Auto check/deposit records, and later loan-history entries confirmed the same specific payment path: State Auto check number 1001366503, in the amount of $304,640.05, posted or cleared on or about August 23, 2023, for Shellpoint Mortgage Servicing and loan number 9716285110, while Shellpoint/NewRez continued acceleration, foreclosure, lender-placed-insurance, escrow, and adverse credit-reporting activity. **(See Ex. C, EX-037, McALKICH--000054 to McALKICH--000055; Ex. C, EX-040, McALKICH--000056 to McALKICH--000059; Ex. C, EX-041, McALKICH--000060 to McALKICH--000063; Ex. C, EX-042, McALKICH--000064 to McALKICH--000080.)**

32.    Before foreclosure, Shellpoint/NewRez records continued to show unreconciled accelerated, reinstatement, principal, escrow, lender-placed-insurance, and unapplied-funds figures, while principal remained approximately $296,453.67 and the $841.30 unapplied balance persisted. **(See Ex. C, EX-042, McALKICH--000064 to McALKICH--000080.)**

C. SHELLPOINT'S FAILURE TO ACCOUNT AND UNAPPLIED FUNDS LEDGER

33.    Plaintiff repeatedly requested a complete accounting of the loss-draft funds, foreclosure proceeds, escrow activity, lender-placed-insurance charges, foreclosure costs, USDA entries, payoff figures, reinstatement figures, and the $314,608.67 Foreclosure (Cash) entry. **(See Ex. C, EX-075, McALKICH--000090 to McALKICH--000100.)**

34.    Shellpoint/NewRez acknowledged servicing-related written inquiries and stated that the matter was complex or required additional time, but did not provide a timely, complete,

8

intelligible reconciliation before foreclosure harm occurred. **(See Ex. C, EX-075, McALKICH--000090 to McALKICH--000100.)**

35. Plaintiff alleges that Shellpoint/NewRez held a persistent $841.30 in suspense, unapplied, or borrower-credit funds while accelerating the mortgage debt, calculating default interest, assessing foreclosure fees, advancing lender-placed-insurance charges, and continuing foreclosure activity.

36. Shellpoint/NewRez did not apply the $841.30 to monthly installments, principal, escrow, late charges, fees, protective advances, or any other account component in a manner that reduced the asserted default or exposed whether any claimed arrearage was genuine. Plaintiff alleges that Shellpoint/NewRez's decision to leave borrower funds unapplied while asserting escalating arrearages and foreclosure eligibility is evidence that Shellpoint/NewRez maintained the account in an artificial default posture.

37. Shellpoint/NewRez's later loan history reflected an Unapplied Payment entry of $841.30 on or about February 23, 2024, in the same accounting sequence as the $304,640.05 Loss Draft Payment and the $314,608.67 Foreclosure (Cash) entry. **(See Ex. C, EX-042, McALKICH--000064 to McALKICH--000080.)**

38. The February 23, 2024 account sequence reflected payments or entries for foreclosure costs, appraisal costs, attorney costs, property inspections, escrow-only payment, foreclosure cash, late-charge waiver, NSF-fee waiver, USDA rural housing disbursement, and the $841.30 unapplied balance. **(See Ex. C, EX-042, McALKICH--000064 to McALKICH--000080.)**

39. The eight-day sequence is central to Plaintiff's artificial-default theory: the foreclosure sale occurred on February 15, 2024, and the account-level ledger entries reflecting

the $304,640.05 Loss Draft Payment and the $314,608.67 Foreclosure (Cash) transaction appeared on February 23, 2024. Plaintiff alleges that the timing supports an inference that the funds and account adjustments were controlled or calculable before Plaintiff's property interest was extinguished, but were not credited, disclosed, or reconciled in a manner that prevented or corrected the sale. **(See Ex. C, EX-042, McALKICH--000064 to McALKICH--000080; Ex. C, EX-050, McALKICH--000081 to McALKICH--000089.)**

40. Plaintiff alleges that these unreconciled statements, payoff quotes, and ledger entries created and maintained an artificial default: Shellpoint/NewRez continued to treat the account as foreclosable while its own records and payment path reflected a near-payoff-sized insurance payment and persistent borrower-credit or unapplied funds.

41. Shellpoint-related communications variously described the same insurance proceeds as having been applied to principal, housed and held as loss-draft funds, and later combined with foreclosure-sale proceeds to complete payoff of the loan. Those descriptions were not self-reconciling, and Shellpoint/NewRez did not provide the account-level postings, worksheets, and reconciliations necessary to explain which description was true, when it became true, and how the description could coexist with continued acceleration and foreclosure activity.

42. Plaintiff alleges that Shellpoint/NewRez had the systems, records, payment histories, loss-draft records, foreclosure records, investor records, and internal accounting data necessary to reconcile the account but did not provide a complete accounting when Plaintiff needed it to prevent foreclosure, challenge the claimed amounts, or obtain informed redemption financing.

**D. THE FEBRUARY 2024 WRONGFUL FORECLOSURE SALE**

43.    Shellpoint/NewRez continued foreclosure activity after the State Auto mortgagee-payment event and while Plaintiff was seeking information about the payment, payoff, loss draft, foreclosure figures, and account status.

44.    Shellpoint/NewRez nevertheless continued to treat the mortgage loan as accelerated, delinquent, and foreclosure-eligible without giving Plaintiff a complete account-level accounting for the $304,640.05 payment and $841.30 unapplied funds before sale.

45.    Plaintiff alleges that the foreclosure figures were materially overstated, unreconciled, or misleading because they did not timely and accurately credit, apply, restrict, release, return, or explain the State Auto mortgagee insurance payment and related account-credit effect.

46.    Plaintiff alleges that the foreclosure process was materially irregular because the amounts communicated or relied upon for reinstatement, payoff, acceleration, foreclosure, sale, and redemption did not provide the true accounting effect of the insurance payment, the foreclosure proceeds, escrow advances, lender-placed-insurance charges, and unapplied funds.

47.    The foreclosure sale occurred on or about February 15, 2024; the sheriff-sale packet reflects a sheriff's deed/sale amount of $25,500.00 and a redemption affidavit identifying $25,501.00 plus per diem interest. **(See Ex. C, EX-050, McALKICH--000081 to McALKICH--000089.)**

48.    After foreclosure, Shellpoint/NewRez pursued or transmitted USDA guaranteed-loan claim materials for loan number 9716285110, including materials later obtained or identified through FOIA case numbers 2025-RD-09594-F and 2025-RD-08021-F.

49. USDA materials showed that the claim path required or requested liquidation and insurance-loss documentation, including servicing history or notes, attorney chronology, foreclosure deed, redemption confirmation, originator documents, adjuster's report, settlement explanation, hazard-insurance documentation, and related claim materials.

50. USDA records reflected severe fire damage, treatment of State Auto insurance proceeds as other recovery, missing insurance-adjuster documentation, and zero-paid claim processing or adjustment on or about October 18, 2024, with the zero-paid position maintained on or about October 28, 2024.

51. Plaintiff alleges the USDA records support the inference that Shellpoint/NewRez pursued foreclosure liquidation and guarantee-claim treatment while the insurance-payment and loss-draft accounting remained unreconciled and while the guarantor lacked requested insurance documentation. Plaintiff does not allege that USDA actually paid the lender after USDA processed the claim as zero paid.

52. After foreclosure, Plaintiff diligently continued requesting information from State Auto, Shellpoint/NewRez, USDA, Trott, Sterling, CRAs, and others concerning the insurance payment, loss-draft accounting, foreclosure proceeds, loan balance, USDA claim records, and credit reporting.

53. State Auto, USDA, Shellpoint/NewRez, foreclosure counsel, and Sterling each directed Plaintiff elsewhere for payment-application or account-level information, creating a circular referral loop that delayed Plaintiff's ability to discover the payment calculation, payee, check clearance, loss-draft routing, mortgage-account posting, foreclosure-accounting effect, USDA claim treatment, and credit-reporting effect of the $304,640.05 payment.

54.    To the extent any Defendant asserts limitations, notice, proof-of-loss, cooperation, examination, causation, or delay defenses, Plaintiff alleges those defenses are barred, tolled, estopped, waived, or limited by Defendants' own conduct, delayed disclosure, concealment, circular referral, and failure to provide material information.

55.    Plaintiff alleges that Shellpoint/NewRez did not provide a complete documented evaluation showing why disaster-related forbearance, special forbearance, mortgage recovery advance, modification, insurance-proceeds application, rebuild administration, or other USDA servicing alternatives were unavailable before foreclosure and liquidation.

## V. CLAIMS FOR RELIEF

### COUNT I - RESPA AND REGULATION X
*AGAINST NEWREZ/SHELLPOINT*

56.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

57.    At all relevant times, Shellpoint/NewRez was a servicer for Plaintiff's mortgage loan and received written Notices of Error, Requests for Information, and/or Qualified Written Requests that identified Plaintiff, loan number 9716285110, and servicing errors or information requests concerning the $304,640.05 loss-draft payment, $841.30 unapplied funds, payoff figures, foreclosure figures, escrow, lender-placed insurance, USDA records, and credit-reporting effects.

58.    Shellpoint/NewRez acknowledged servicing-related written inquiries and represented that the matter was complex and required additional time to respond. **(See Ex. C, EX-075, McALKICH--000090 to McALKICH--000100.)**

59.     Shellpoint/NewRez failed to conduct a reasonable investigation and failed to correct or adequately explain the servicing errors identified in Plaintiff's notices of error within the time required by RESPA and Regulation X.

60.     The acknowledgement letters and complex-matter extensions did not satisfy 12 C.F.R. Section 1024.35(e). Plaintiff alleges that Shellpoint/NewRez was required to conduct a reasonable servicing investigation, correct the errors or provide a substantive written explanation, and identify the records supporting its position, but instead delayed, withheld, or failed to provide the loss-draft, suspense, escrow, foreclosure, and payment-posting reconciliation needed to understand the account.

61.     Shellpoint/NewRez failed to provide complete, responsive, and intelligible information requested through Plaintiff's requests for information within the time required by RESPA and Regulation X.

62.     Plaintiff further alleges that Shellpoint/NewRez violated 12 C.F.R. Section 1024.35(i) to the extent it furnished adverse information to any consumer reporting agency regarding payments or account amounts that were the subject of Plaintiff's notices of error during the 60-day period after receiving those notices. The adverse reporting included delinquency, foreclosure, balance, payment-history, or account-status information tied to the disputed payment application, loss-draft payment, escrow, suspense, and foreclosure-accounting issues.

63.     Plaintiff also alleges that Shellpoint/NewRez violated Regulation X loss-mitigation protections, including 12 C.F.R. Section 1024.41, by treating the loan as foreclosable during or immediately after the approved forbearance/loss-mitigation posture and after a catastrophic fire displacement, without a complete documented evaluation of available loss-

14

mitigation, disaster-related, insurance-proceeds, and post-transfer servicing alternatives before foreclosure-related escalation and sale activity.

64.     Shellpoint/NewRez also failed to investigate and reconcile the prior-servicer forbearance, USDA/FOIA forbearance notation, county-recorded transfer or assignment date, and Shellpoint/NewRez's own three-month forbearance records before treating the loan as continuously delinquent, foreclosable, and reportable as severely past due.

65.     The failure to properly respond to the notices of error caused actual damages because Plaintiff lacked the account-level error correction and accounting information needed to challenge the foreclosure figures, demand cancellation or recalculation of the foreclosure, dispute the claimed arrears, and prevent or mitigate foreclosure and redemption harm.

66.     The failure to properly respond to the requests for information caused actual damages because Shellpoint/NewRez's withholding, delay, or incomplete production of the ledger and payment records left Plaintiff without the information needed to secure accurate redemption financing, challenge the foreclosure sale, calculate the true debt, determine whether a surplus or release existed, and correct related credit reporting.

67.     Later production did not cure the harm because the complete payment-history and accounting information needed to challenge the account was not provided until after foreclosure and redemption-related damage had already occurred.

68.     NewRez/Shellpoint's failures caused actual damages traceable to the servicing-response failures themselves, including loss of the chance to correct the account before foreclosure, inability to challenge the true payoff or reinstatement amount before sale, inability to obtain accurate redemption information, redemption-related financing and costs, repeated correspondence, certified-mail and postage expenses, printing and copying expenses, transcript

and record-retrieval expenses, telephone and administrative costs, time loss, lost work time to the extent proven, emotional distress where recoverable, and credit and employment harms flowing from the unreconciled account.

69.    Defendants' repeated and systematic failures to provide substantive responses to Plaintiff's multiple Qualified Written Requests, Notices of Error, and Requests for Information, as detailed herein, constitute a pattern or practice of noncompliance with RESPA under 12 U.S.C. Section 2605(f)(1)(B).

## COUNT II - BREACH OF NOTE, MORTGAGE, SECURITY INSTRUMENT, AND SERVICING OBLIGATIONS
### *AGAINST NEWREZ/SHELLPOINT*

70.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

71.    NewRez LLC d/b/a Shellpoint Mortgage Servicing acted as servicer, mortgagee representative, payoff-quote issuer, foreclosure initiator, insurance-proceeds recipient or controller, escrow administrator, and furnisher of credit information concerning loan number 9716285110, and exercised rights and duties arising from the Note, Mortgage, Security Instrument, USDA Rider, and related servicing documents.

72.    The Note, Mortgage, USDA Rider, Security Instrument, and related loan documents imposed enforceable obligations governing application of payments and credits, escrow items, property-insurance proceeds and loss drafts, protection of the property and lien, default and acceleration figures, payoff and reinstatement figures, notice of grievance, foreclosure activity, and servicing of the loan. **(See Ex. C, EX-001, McALKICH--000001 to McALKICH--000004; Ex. C, EX-002, McALKICH--000005 to McALKICH--000018; Ex. C, EX-004, McALKICH--000019 to McALKICH--000020.)**

16

73.     Because the loan was a USDA Rural Development guaranteed loan, Plaintiff alleges that the Note, Mortgage, USDA Rider, and related loan documents made the USDA Single Family Housing Guaranteed Loan Program servicing framework, including 7 C.F.R. Part 3555 and the reasonable-servicing requirements applicable to performing and non-performing USDA guaranteed loans, part of the contractual and servicing standards governing Shellpoint/NewRez's conduct.

74.     The proceeds were distinctly identifiable because they were tied to a specific instrument, amount, claim number, policy number, property, loan number, mortgagee-interest calculation, and payment path, and because Defendants had obligations to apply, restrict, return, release, credit, or account for them only through an authorized loss-draft, mortgagee, payoff, or servicing process.

75.     Shellpoint/NewRez breached the Application of Payments clause or related payment-application obligations by failing to properly apply or account for the $841.30 in unapplied or suspense funds and by failing to timely and transparently apply, credit, restrict, release, refund, or reconcile the $304,640.05 mortgagee insurance payment and related account-credit effect.

76.     Shellpoint/NewRez also breached the loan documents, payoff obligations, and related Michigan mortgage-discharge obligations by failing to apply sufficient payoff or mortgagee-insurance funds to satisfy, release, or discharge the mortgage lien when the debt was paid, satisfied, or should have been deemed materially satisfied.

77.     Shellpoint/NewRez breached the Notice of Grievance or related dispute-resolution obligations by failing to provide a complete, intelligible, and timely response to

Plaintiff's repeated written and oral grievances concerning the loss-draft payment, unapplied funds, payoff, foreclosure figures, and accounting.

78.     Shellpoint/NewRez breached those obligations by continuing to treat the loan as unpaid or unreconciled, charging or advancing escrow, lender-placed-insurance, foreclosure, appraisal, attorney, inspection, and other disputed costs, proceeding with foreclosure based on materially overstated or unreconciled figures, and failing to correct the account.

79.     As a result, Plaintiff suffered contract and consequential damages including foreclosure and redemption costs, excess or unreconciled charges, loss of use and loss of property rights, credit harm flowing from the same account breach, fees, costs, time loss, and other damages recoverable under the loan documents and law.

## COUNT III - WRONGFUL FORECLOSURE / MATERIALLY OVERSTATED FORECLOSURE
*AGAINST NEWREZ/SHELLPOINT*

80.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

81.     Plaintiff does not allege merely that he disagreed with the amount owed. Plaintiff alleges foreclosure-process irregularities affecting the foreclosure referral, statutory and borrower notices, payoff figures, reinstatement figures, acceleration figures, attorney-file figures, bid or sale accounting, redemption pressure, and post-sale accounting.

82.     Those foreclosure-stage figures and records were materially misstated, overstated, or unreconciled because they failed to account for the specific $304,640.05 insurance-payment event, $841.30 unapplied funds, and related debt-reduction/accounting effect before the foreclosure sale.

83.    The foreclosure-stage figures were further misstated, overstated, or unreconciled because the known recovery and credit events--including the $304,640.05 insurance payment, approximately $25,501.00 foreclosure auction or sale amount, and approximately $1,801.65 escrow or lender-placed-insurance refund--appear to exceed the July 11, 2023 and September 14, 2023 payoff figures. **(See Ex. C, EX-037, McALKICH--000054 to McALKICH--000055; Ex. C, EX-040, McALKICH--000056 to McALKICH--000059; Ex. C, EX-041, McALKICH--000060 to McALKICH--000063; Ex. C, EX-042, McALKICH--000064 to McALKICH--000080; Ex. C, EX-050, McALKICH--000081 to McALKICH--000089.)**

84.    The foreclosure was also irregular because Shellpoint/NewRez failed to release, discharge, or satisfy the mortgage after receiving and controlling funds that should have satisfied or materially reduced the secured debt, and instead used foreclosure to clear or extinguish a lien that should not have remained unreconciled.

85.    The power of sale was exercised in violation of the mortgage terms because the default was cured, or should have been cured, by the receipt of insurance proceeds, or at minimum the asserted default and payoff figures were required to be recalculated before foreclosure proceeded.

86.    The foreclosure irregularity was also material because the loan was a USDA guaranteed loan secured by Plaintiff's principal residence. Plaintiff alleges that Shellpoint/NewRez was required to consider and document reasonable loss-mitigation, disaster-related, insurance-proceeds, and USDA servicing alternatives before foreclosure, and that it instead pursued foreclosure while the loss-draft, payoff, forbearance, escrow, and USDA documentation issues remained unresolved.

87.     The irregularity was material because the disputed figures controlled whether foreclosure should continue, what amount Plaintiff was told he needed to reinstate or pay off the loan, what foreclosure counsel was told to collect, what amount justified sale activity, and how sale proceeds and liquidation figures were later treated.

88.     The foreclosure also functioned as the liquidation event Shellpoint/NewRez later used or attempted to use in the USDA guaranteed-loan claim path, making the accuracy of the pre-foreclosure and post-foreclosure accounting material to Plaintiff, the lien, and the guaranteed-loan recovery process.

89.     NewRez/Shellpoint's irregularities prejudiced Plaintiff by preventing him from knowing the true amount needed to stop the sale, preventing him from using the insurance-payment facts to demand cancellation or recalculation before sale, preventing timely challenge to the foreclosure figures, forcing redemption-related action and financing, and causing property, credit, and consequential damages. These allegations satisfy the Michigan wrongful-foreclosure prejudice standard in Kim v. JPMorgan Chase Bank, N.A., 493 Mich. 98, 115-116, 825 N.W.2d 329 (2012), because absent the irregular accounting and foreclosure process, Plaintiff would have been in a better position to preserve his property interest.

## COUNT IV - COMMON-LAW CONVERSION AND STATUTORY CONVERSION OF IDENTIFIABLE INSURANCE PROCEEDS
### AGAINST NEWREZ/SHELLPOINT AND STERLING

90.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

91.     This count does not allege a mere failure to pay a debt. The converted property was a specific, identifiable insurance-loss instrument, payment, and account-credit effect: check number 1001366503, in the amount of $304,640.05, tied to State Auto claim number

PR-0000000-467718, policy number 1001110558, the fire-damaged property at 1610 Spencer Road SE, Kalkaska, Michigan, Shellpoint/NewRez loan number 9716285110, and the check/deposit record showing the mortgagee payment to Shellpoint Mortgage Servicing for the account of Robert McAlkich. **(See Ex. C, EX-037, McALKICH--000054 to McALKICH--000055.)**

92.     Although check number 1001366503 was made payable through the mortgagee or servicer channel, Plaintiff alleges that he possessed a vested contractual, equitable, and borrower-facing property interest in the proceeds and their account-credit effect under the insurance policy, mortgage, loss-draft process, payoff calculation, and secured-debt relationship. Plaintiff's protected interest was the right to have the proceeds applied to an authorized purpose, including restoration, restricted escrow, debt reduction, payoff, lien release, surplus return, or accurate accounting, rather than to have the proceeds held, delayed, floated, or reflected in internal ledgers while the same debt was treated as unreduced and foreclosable.

93.     The payment was not a generic sum of money. It was a restricted mortgagee/loss-draft payment made for a specific purpose: to satisfy, reduce, credit, reconcile, release, or otherwise account for Shellpoint/NewRez's mortgagee interest according to the policy, mortgage clause, loan documents, payoff calculation, and loss-draft process.

94.     NewRez/Shellpoint's control over the payment was limited by the policy, mortgage, payoff/payment purpose, secured-debt relationship, loss-draft process, and borrower-facing account-credit effect. Once the payment was received, cleared, held, posted, or controlled, NewRez/Shellpoint could not treat the same secured debt as unreduced for foreclosure purposes while later using or reflecting the same proceeds in liquidation accounting without timely and accurate application, restriction, release, refund, or explanation.

95. NewRez/Shellpoint received, controlled, held, posted, delayed, applied, retained, transferred, used, reported, or otherwise exercised dominion over the $304,640.05 payment and the related account credit in a manner inconsistent with Plaintiff's protected interests and the required treatment of the debt and insurance proceeds.

96. Plaintiff alleges that Shellpoint/NewRez converted the $304,640.05 insurance payout or its account-credit effect to its own use by applying, retaining, transferring, reporting, or reflecting it in internal corporate, investor, suspense, foreclosure, liquidation, reimbursement, reserve, or offset accounting while Plaintiff was denied timely application, release, reconciliation, or accounting.

97. The alleged dominion was wrongful because NewRez/Shellpoint continued to treat the debt as unpaid or unreconciled, continued the foreclosure path, and later used or reflected the funds in post-sale liquidation accounting without first providing Plaintiff the debt-reduction/accounting effect required by the payment's purpose or a timely, complete, and intelligible accounting.

98. Sterling participated in creating and controlling the routing path for the payment by communicating or maintaining mortgagee-claim, proof-of-loss, payoff-backed loss-draft, payment-routing, or claim-document information. Sterling's alleged role was not ordinary loan servicing; it was participation in the identifiable payment path that moved the specific insurance proceeds into the mortgagee/loss-draft channel.

99. Sterling exercised or assisted dominion over the identifiable proceeds to the extent it directed, processed, transmitted, maintained, withheld, or failed to disclose records and instructions controlling the path, purpose, payee, and routing of the $304,640.05 payment, while

Plaintiff was left without the information needed to determine how the proceeds affected the mortgage debt before foreclosure.

100.   Plaintiff alleges that Defendants' dominion over the payment and account-credit effect was inconsistent with Plaintiff's rights because the payment was handled, held, routed, delayed, used, or reflected in liquidation accounting while Shellpoint/NewRez continued to treat the secured debt as unpaid or unreconciled for foreclosure and credit-reporting purposes.

101.   Defendants used or benefited from the proceeds and their account effect in a manner personal to their interests, including protecting, reducing, liquidating, accounting for, transferring, reporting, or presenting the mortgagee, servicer, investor, claim, guarantee, or foreclosure position while Plaintiff was denied timely application, release, reconciliation, accounting, or credit of the identifiable proceeds.

102.   This conversion claim is pleaded in the alternative to contract, servicing, accounting, unjust-enrichment, equitable, and declaratory theories. To the extent the Court determines any portion of the claim is more properly characterized under those theories, Plaintiff preserves those remedies and does not abandon them.

103.   Plaintiff seeks actual damages, statutory damages where available, treble damages under MCL 600.2919a where available, costs, interest, and all other relief permitted by law.

### COUNT V - FDCPA
*AGAINST NEWREZ/SHELLPOINT IN THE ALTERNATIVE*

104.   Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

105.   Plaintiff pleads this count in the alternative. On information and belief, NewRez/Shellpoint acted as a debt collector for the collection activity at issue because it

obtained, boarded, serviced, or attempted to collect the account after it treated the account as already in default.

106.    When Shellpoint/NewRez acquired the servicing rights on or about November 1, 2022, the loan was being treated as in default or delinquent since January 1, 2022. Plaintiff therefore alleges, in the alternative, that Shellpoint/NewRez qualifies as a debt collector under 15 U.S.C. Section 1692a(6) for the collection conduct at issue because the debt was in default at the time it was obtained or acquired for servicing or collection purposes.

107.    NewRez/Shellpoint communicated with Plaintiff in connection with collection of the mortgage debt through payoff quotes, monthly statements, foreclosure communications, loss-mitigation or deed-in-lieu communications, telephone collection communications, and foreclosure-related account positions.

108.    The specific false, deceptive, misleading, unfair, or unconscionable collection representations included payoff figures, reinstatement figures, accelerated balances, foreclosure balances, statements treating the debt as collectible in unreconciled amounts, and communications that failed to account for the $304,640.05 insurance-payment event, the $841.30 unapplied funds, foreclosure proceeds, escrow, lender-placed-insurance, and USDA-related entries.

109.    Plaintiff further alleges that NewRez/Shellpoint used unfair or unconscionable means to collect or attempt to collect a debt, in violation of 15 U.S.C. Section 1692f, by pursuing foreclosure, payoff, reinstatement, acceleration, and collection amounts that it knew or should have known were fully offset, materially reduced, or at least materially affected by the $304,640.05 insurance proceeds and $841.30 unapplied funds.

110.    Plaintiff suffered actual damages, including emotional distress, time loss, costs, credit harm, employment-related harm to the extent caused by collection-related reporting or communications, and other injuries. Plaintiff seeks actual damages, statutory damages, costs, and all relief available under the FDCPA.

## COUNT VI - FCRA FURNISHER LIABILITY
*AGAINST NEWREZ/SHELLPOINT*

111.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

112.    NewRez/Shellpoint furnished information concerning Plaintiff's mortgage account to consumer reporting agencies.

113.    Plaintiff does not plead a private claim directly under 15 U.S.C. Section 1681s-2(a). Plaintiff's furnisher claim is based on NewRez/Shellpoint's duties under 15 U.S.C. Section 1681s-2(b) after receiving notice of disputes from consumer reporting agencies.

114.    Upon receiving Plaintiff's disputes, one or more consumer reporting agencies notified NewRez/Shellpoint of the disputes through automated or manual dispute notices, including ACDV or e-OSCAR-type notices, thereby triggering NewRez/Shellpoint's statutory obligations under 15 U.S.C. Section 1681s-2(b) to conduct a reasonable investigation, review all relevant information provided through the CRA dispute process, and correct, modify, delete, or permanently block inaccurate, incomplete, misleading, or unverifiable reporting.

115.    The dispute mechanisms included CRA dispute submissions, reinvestigation results, automated consumer dispute verification processes, e-OSCAR or ACDV-type communications, and later dispute-result records in which Equifax, Trans Union, or Experian

reported the Shellpoint/NewRez mortgage tradeline as verified, updated, or continued despite Plaintiff's dispute of the insurance-payment, foreclosure, and delinquency reporting.

116.    The CRA-dispute chronology includes post-dispute reporting and dispute-result records involving Experian, Equifax, and Trans Union after Plaintiff disputed the mortgage tradeline and after Shellpoint/NewRez had access to its own loan history, loss-draft records, payoff quotes, foreclosure records, and February 23, 2024 posting entries.

117.    NewRez/Shellpoint was required to conduct a reasonable investigation, review all relevant information provided through the dispute process, and correct, modify, delete, or permanently block information that was inaccurate, incomplete, misleading, or unverifiable.

118.    A reasonable furnisher investigation required review of NewRez/Shellpoint's own loan history, July 2023 and September 2023 payoff quotes, loss-draft records, State Auto mortgagee-payment information, payment-posting records, February 23, 2024 Loss Draft Payment and Foreclosure (Cash) entries, foreclosure referral and sale records, escrow records, lender-placed-insurance records, forbearance or boarding records, USDA claim records, and credit-furnishing data. **(See Ex. C, EX-093, McALKICH--000101 to McALKICH--000102; Ex. C, EX-037, McALKICH--000054 to McALKICH--000055; Ex. C, EX-040, McALKICH--000056 to McALKICH--000059; Ex. C, EX-041, McALKICH--000060 to McALKICH--000063; Ex. C, EX-042, McALKICH--000064 to McALKICH--000080; Ex. C, EX-050, McALKICH--000081 to McALKICH--000089.)**

119.    NewRez/Shellpoint nevertheless verified, continued furnishing, or failed to correct the mortgage tradeline without reconciling the objective contradiction between the approximately $304,640 insurance payment or payment-related entry, the $0 balance reporting,

26

the continued severe delinquency and foreclosure reporting, and Shellpoint/NewRez's own internal loss-draft and foreclosure-accounting records.

120.    A minimally reasonable furnisher investigation would have flagged the facial inconsistency between the near-payoff-sized insurance payment, $0 balance or payment-related reporting, severe delinquency history, foreclosure reporting, and Shellpoint/NewRez's own unreconciled loss-draft and foreclosure-accounting records.

121.    Verifying or continuing to furnish the tradeline despite the known $304,640.05 insurance payment, $841.30 unapplied funds, $0 balance or payment history, severe delinquency, and foreclosure reporting was not a mere mistake. Plaintiff alleges it was reckless disregard for the truth because Shellpoint/NewRez possessed the account records needed to determine that the reporting was incomplete, inaccurate, misleading, or unverifiable.

122.    NewRez/Shellpoint's conduct was negligent and/or willful and caused Plaintiff actual damages, statutory damages where available, punitive damages where available, costs, fees where available, and other relief under the FCRA.

## COUNT VII – FCRA
### AGAINST EQUIFAX INFORMATION SERVICES LLC

123.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

124.    Equifax is a consumer reporting agency within the meaning of the FCRA.

125.    Plaintiff disputed the completeness and accuracy of the Shellpoint/NewRez mortgage tradeline with Equifax.

126.    Equifax was not asked to accept Plaintiff's unsupported word over Shellpoint/NewRez's word. Equifax was presented with objective, facial inconsistencies in the

tradeline itself, including a major August 2023 payment or payment-related entry of approximately $304,640, severe delinquency progression, foreclosure status, and later $0 balance reporting without a coherent explanation of the insurance-payment and foreclosure-accounting effect.

127.    Equifax reported or published the Shellpoint/NewRez tradeline with severe delinquency or foreclosure reporting while also reporting a $0 balance or other information that Plaintiff alleges was objectively contradictory given the $304,640.05 insurance-payment event and unresolved foreclosure accounting. **(See Ex. C, EX-146, McALKICH--000116 to McALKICH--000123.)**

128.    Equifax failed to follow reasonable procedures to assure maximum possible accuracy under 15 U.S.C. Section 1681e(b) by publishing or maintaining the inaccurate, incomplete, or misleading mortgage tradeline and by failing to maintain reasonable file-matching and identity procedures.

129.    Equifax failed to conduct a reasonable reinvestigation under 15 U.S.C. Section 1681i, failed to review and consider relevant information, failed to transmit the substance of Plaintiff's dispute to Shellpoint/NewRez, and failed to delete, modify, suppress, or correct information that was inaccurate, incomplete, misleading, or unverifiable.

130.    Equifax's reinvestigation was patently unreasonable because the contradiction appeared on the face of the reporting and dispute materials: the same mortgage tradeline reflected a near-payoff-sized payment or zero-balance condition while also communicating severe delinquency and foreclosure without reconciling the account-payment sequence.

131.    Equifax's December 22, 2025 dispute-result packet, confirmation number 5335531766, stated that Equifax contacted the reporting company, provided relevant information

and supporting documentation, requested verification, and reported modified fields for the Shellpoint Mortgage Servicing account ending in 5110, including Additional Information, Closed Date, Terms Duration, Actual Payment, Historical Account Information, and Account History. **(See Ex. C, EX-146, McALKICH--000116 to McALKICH--000123.)**

132.    Equifax's continued publication, reinvestigation, verification, or failure to correct the tradeline after notice of the $304,640.05 payment, $0 balance, foreclosure comment, and severe delinquency contradiction constitutes evidence of reckless disregard for the truth and supports willful liability under 15 U.S.C. Section 1681n.

133.    Equifax's conduct was negligent and/or willful and caused Plaintiff actual damages, statutory damages where available, punitive damages where available, costs, fees where available, and other relief under the FCRA.

## COUNT VIII – FCRA
### *AGAINST TRANS UNION LLC*

134.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

135.    Trans Union is a consumer reporting agency within the meaning of the FCRA.

136.    Plaintiff disputed the completeness and accuracy of the Shellpoint/NewRez mortgage tradeline with Trans Union.

137.    Trans Union failed to follow reasonable procedures to assure maximum possible accuracy under 15 U.S.C. Section 1681e(b) by publishing or maintaining mortgage reporting that was inaccurate, incomplete, or materially misleading in light of the forbearance, insurance-payment, foreclosure, redemption, and transfer-accounting facts.

138.    Trans Union failed to conduct a reasonable reinvestigation under 15 U.S.C. Section 1681i, failed to review and consider relevant information, failed to adequately transmit the substance of Plaintiff's dispute to Shellpoint/NewRez, and failed to delete, modify, suppress, or correct information that was inaccurate, incomplete, misleading, or unverifiable.

139.    A reasonable Trans Union reinvestigation would have reconciled the Shellpoint/NewRez mortgage reporting with the prior Caliber transfer or paying-as-agreed reporting, the State Auto insurance-payment records, the payoff quotes, the foreclosure/redemption records, and the disputed severe delinquency and foreclosure history. **(See Ex. C, EX-093, McALKICH--000101 to McALKICH--000102; Ex. C, EX-141, McALKICH--000110 to McALKICH--000115; Ex. C, EX-147, McALKICH--000124 to McALKICH--000125.)**

140.    Trans Union's continued reporting, verification, or failure to correct the tradeline after objective notice of the insurance-payment and foreclosure-accounting contradiction constitutes evidence of reckless disregard for the truth and supports willful liability under 15 U.S.C. Section 1681n.

141.    Trans Union's conduct was negligent and/or willful and caused Plaintiff actual damages, statutory damages where available, punitive damages where available, costs, fees where available, and other relief under the FCRA.

## COUNT IX - FCRA
*AGAINST EXPERIAN INFORMATION SOLUTIONS, INC.*

142.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

143.    Experian is a consumer reporting agency within the meaning of the FCRA.

30

144. Plaintiff disputed the completeness and accuracy of the Shellpoint/NewRez/NR-SMS-CAL mortgage tradeline with Experian.

145. Experian's April 27, 2024 dispute result identified the NR/SMS/CAL account ending 971628XXXX as a mortgage account opened April 14, 2021, reported as foreclosed, updated after reinvestigation, and continuing to show severe delinquency history.

146. Equifax's December 22, 2025 dispute-result packet reflected Shellpoint Mortgage Servicing reporting for the account ending in 5110, including a $0 balance, high credit of $302,929, historical foreclosure and delinquency reporting, and account-history status codes that Plaintiff alleges remained materially misleading when compared with the unresolved $304,640.05 insurance-payment and foreclosure-accounting records. **(See Ex. C, EX-146, McALKICH--000116 to McALKICH--000123.)**

147. Experian failed to follow reasonable procedures to assure maximum possible accuracy under 15 U.S.C. Section 1681e(b), failed to conduct a reasonable reinvestigation under 15 U.S.C. Section 1681i, failed to review and consider relevant information, failed to adequately transmit the substance of Plaintiff's dispute to Shellpoint/NewRez, and failed to delete, modify, suppress, or correct information that was inaccurate, incomplete, misleading, or unverifiable.

148. Experian's reinvestigation was patently unreasonable because Experian's own dispute result reflected the August 2023 payment information, severe delinquency history, foreclosure reporting, and Plaintiff's consumer statement linking the delinquency to the insurance-claim delay, yet Experian continued to verify or publish the tradeline without correcting the core accounting contradiction.

149. Experian's continued reporting, verification, or failure to correct the tradeline after objective notice of the insurance-payment and foreclosure-accounting contradiction constitutes

evidence of reckless disregard for the truth and supports willful liability under 15 U.S.C. Section 1681n.

150.    Experian's conduct was negligent and/or willful and caused Plaintiff actual damages, statutory damages where available, punitive damages where available, costs, fees where available, and other relief under the FCRA.

## COUNT X - BREACH OF INSURANCE CONTRACT
### *AGAINST STATE AUTO*

151.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

152.    State Auto issued homeowner's policy number 1001110558 to Plaintiff covering the property located at 1610 Spencer Road SE, Kalkaska, Michigan.

153.    Plaintiff suffered a covered fire loss during the policy period and timely reported the loss.

154.    State Auto breached the insurance contract by denying, withholding, failing to resolve, or failing to pay benefits owed to Plaintiff, including dwelling, other-structures, personal-property, loss-of-use or additional-living-expense benefits, and related benefits available under the policy, subject to proof at trial.

155.    Separately, State Auto's mortgagee-payment handling impaired Plaintiff's policy rights because State Auto paid or caused payment of the $304,640.05 mortgagee proceeds without providing Plaintiff effective notice of the payee, check, calculation, clearance, purpose, or intended loan-account effect before foreclosure harm occurred.

156.    State Auto's denial, payment handling, notice handling, misdelivery or ineffective delivery, failure to effectively disclose material payment facts, refusal or failure to provide

32

usable information while Plaintiff was displaced, and referral of Plaintiff to Shellpoint/NewRez or Sterling breached or impaired Plaintiff's policy rights and caused damages.

157.    To the extent State Auto asserts proof-of-loss, cooperation, examination, notice, or suit-limitation defenses, Plaintiff alleges those defenses are barred, tolled, estopped, waived, or limited by State Auto's own conduct, Plaintiff's displacement, ineffective notice, circular referral, delayed disclosure, and the fact that State Auto paid the mortgagee side of the same claim.

158.    As a result, Plaintiff suffered actual damages including policy-benefit damages, loss-of-use damages, property-related damages, foreclosure-related damages caused by the mortgagee-payment and referral loop, accounting damages, emotional distress where recoverable, time loss, costs, and other consequential damages.

### COUNT XI - MICHIGAN INSURANCE STATUTORY INTEREST AND DECLARATORY RELIEF
*AGAINST STATE AUTO*

159.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

160.    State Auto's denial and claim handling also damaged Plaintiff by leaving unresolved cleanup, debris, blight, loss-of-use, and site-condition issues while State Auto paid the mortgagee side of the same claim and asserted policy defenses that foreseeably compounded public and investigative suspicion of Plaintiff.

161.    State Auto failed to timely and properly pay, resolve, or disclose insurance benefits owed to Plaintiff under the policy and Michigan law, including benefits related to dwelling, other structures, personal property, loss of use, additional living expense, and other covered losses to the extent established by the evidence.

162.    Plaintiff seeks statutory interest under MCL 500.2006 to the extent benefits were not timely paid, were improperly withheld, were not properly resolved, or were handled in a way that prevented Plaintiff from receiving the benefit of the policy when payment became due.

163.    Plaintiff also seeks a declaration concerning State Auto's obligations under the policy, the legal effect of the mortgagee payment, the effect of State Auto's denial and payment handling, the effect of the returned or ineffective denial-mailing path, and whether State Auto's conduct impaired Plaintiff's insured rights and ability to comply with or challenge claimed policy conditions.

164.    Plaintiff further seeks a declaration that State Auto may not rely on limitations, proof-of-loss, cooperation, examination, notice, or delay defenses to the extent State Auto caused, worsened, or benefited from the conditions it asserts.

## COUNT XII - NEGLIGENCE / NEGLIGENT UNDERTAKING / CLAIM-HANDLING AND PAYMENT-ROUTING
### *AGAINST STERLING CLAIMS MANAGEMENT, INC.*

165.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

166.    Sterling did not merely appear in the background. Sterling undertook or participated in a defined mortgagee-claim role involving notice of loss, proof-of-loss materials, payoff or mortgagee-interest information, payment instructions, claim documents, inspection or claim-status communications, and loss-draft routing for Plaintiff's property, policy, loan, State Auto, and Shellpoint/NewRez.

167.    Sterling's undertaking included communications or records identifying Shellpoint/NewRez as client or servicer, identifying loan number 9716285110 and Plaintiff's property and policy, and directing or facilitating the mortgagee loss-draft path by which State

34

Auto was instructed to make the loss draft payable for Shellpoint/NewRez's mortgagee interest and route the payment through the mortgagee-claim process.

168.    Sterling's role foreseeably affected Plaintiff because the payment-routing and mortgagee-claim process determined whether the $304,640.05 insurance proceeds would be documented, disclosed, routed, credited, reconciled, restricted, released, or explained before foreclosure harm occurred.

169.    Having undertaken that limited mortgagee-claim and payment-routing role, Sterling owed a duty to exercise reasonable care within the scope of the undertaking, including reasonable care in communications, proof-of-loss handling, payoff or mortgagee-interest information, payment instructions, loss-draft routing, and records within Sterling's own role that would foreseeably affect whether Plaintiff could obtain a timely and accurate accounting before foreclosure.

170.    Sterling voluntarily undertook the administrative task of routing, verifying, tracking, documenting, or communicating the mortgagee insurance-payment path. Having undertaken that role, Sterling could not perform it negligently or recklessly in a way that foreseeably caused the identifiable proceeds to be delayed, misrouted, undocumented, undisclosed, or trapped in servicer suspense, restricted-escrow, or liquidation-accounting channels without a usable borrower-facing explanation.

171.    Sterling knew or should have known that failure to properly document, route, verify, preserve, or disclose the payment path for a $304,640.05 mortgagee insurance payment would foreseeably cause or contribute to the servicer treating the loan as delinquent, maintaining an artificial default, pursuing foreclosure, and transmitting or allowing damaging credit-reporting information concerning the same mortgage account.

172.    Plaintiff does not rely on privity alone. Plaintiff alleges that Sterling's duty arises from its voluntary undertaking, its control or participation in the mortgagee-claim payment path, and the foreseeable risk that negligent payment-routing or documentation would impair Plaintiff's property, loan-accounting, foreclosure, and insurance rights.

173.    Sterling breached that limited duty by participating in or facilitating the mortgagee-claim and payment-routing process without reasonable care to ensure that the resulting $304,640.05 payment and related instructions were accurately documented, disclosed, routed, and capable of being reconciled with Plaintiff's mortgage account, or by failing to provide information within Sterling's own records when Plaintiff later sought the payment-path facts.

174.    Sterling's conduct increased the risk of harm by contributing to a payment path and referral loop in which Plaintiff could not determine the check's purpose, payee, clearance, routing, application, or effect on the debt before foreclosure and redemption harm occurred. Plaintiff does not allege that Sterling owed a generalized duty for servicing, foreclosure, or credit reporting; the alleged duty is limited to Sterling's own mortgagee-claim, proof-of-loss, payoff/payment-information, and loss-draft-routing undertaking.

175.    The circular referral loop among State Auto, Sterling, Shellpoint/NewRez, USDA, and foreclosure-related actors is pleaded as both causation and obstruction: it prevented Plaintiff from obtaining the ledger and payment-path records necessary to mitigate damages, challenge foreclosure figures, verify redemption figures, correct credit reporting, or determine whether the insurance proceeds had satisfied, reduced, or otherwise affected the secured debt.

176.    Sterling's conduct caused actual damages including loss of time, investigation costs, inability to obtain timely payment-path information, foreclosure and redemption-related

harm traceable to the referral loop and delayed accounting, and other damages to be proven through discovery and at trial.

## VI. DAMAGES

177.    Plaintiff seeks actual damages resulting from the conduct alleged above, including foreclosure-related damages, redemption-related damages, loss-draft and accounting damages, insurance-benefit damages, escrow and lender-placed-insurance damages, credit-reporting damages, lost credit opportunities, employment-related harm, out-of-pocket costs, loss of time, and emotional distress where recoverable.

178.    Plaintiff seeks damages for the cost of investigating, disputing, documenting, transcribing, mailing, requesting, and attempting to correct Defendants' conduct, including the substantial time spent attempting to obtain basic account information.

179.    For RESPA and Regulation X damages specifically, Plaintiff seeks out-of-pocket and consequential damages proximately caused by servicing-response failures, including certified-mail postage, copying and printing, record-retrieval and transcript expenses, telephone and administrative costs, lost time and lost work time to the extent proven, and costs incurred to investigate, reconstruct, and dispute the missing loan-accounting, loss-draft, foreclosure, escrow, and credit-reporting records.

180.    Plaintiff seeks employment damages arising from the Tesla Tool and Die Repair opportunity, including lost wages based on the $44.00 hourly rate, lost incentive compensation associated with the $25,000 incentive, lost benefits, lost career opportunity, and consequential damages caused by inaccurate or unreconciled mortgage reporting. **(See Ex. C, EX-097, McALKICH--000103 to McALKICH--000109.)**

181.    The damages also include the loss of a meaningful opportunity to use the $304,640.05 payment, the $841.30 unapplied funds, the payoff quotes, the forbearance records, the State Auto payment records, and the February 23, 2024 ledger entries to prevent foreclosure, obtain accurate redemption financing, correct the account before further credit dissemination, and preserve employment opportunities before the false or misleading mortgage reporting hardened into third-party screening records.

182.    Plaintiff also seeks damages and equitable relief arising from the apparent over-recovery, surplus, or false-deficiency accounting created by the $304,640.05 mortgagee insurance payment, approximately $25,501.00 foreclosure auction or sale amount, approximately $1,801.65 escrow or lender-placed-insurance refund, and all related credits, recoveries, offsets, waivers, refunds, and liquidation entries. **(See Ex. C, EX-037, McALKICH--000054 to McALKICH--000055; Ex. C, EX-042, McALKICH--000064 to McALKICH--000080; Ex. C, EX-050, McALKICH--000081 to McALKICH--000089.)**

183.    Plaintiff seeks damages and declaratory relief arising from Shellpoint/NewRez's failure to release, discharge, satisfy, or correct the mortgage lien after receipt of funds that should have satisfied or materially reduced the secured debt.

184.    Plaintiff seeks damages for cleanup, debris, blight, property-preservation, loss-of-use, site-condition, and related insurance-benefit harms arising from the fire loss and Defendants' handling of the insurance claim, loss-draft process, and property-preservation responsibilities.

185.    Plaintiff seeks damages for reputational harm, humiliation, emotional distress, community stigma, investigative prejudice, fear of criminal accusation, and harm caused by Defendants' false, incomplete, misleading, or unreconciled default, coverage, fire-investigation, foreclosure, and insurance-payment narratives.

186. Plaintiff seeks statutory damages, punitive damages, treble damages, interest, costs, and fee-related relief where available by statute, rule, or law.

187. Plaintiff reserves the right to supplement the damages calculation after discovery and expert review of the loan accounting, credit reporting, foreclosure accounting, insurance records, USDA records, title records, and employment-screening records.

## VII. PRAYER FOR RELIEF

188. Plaintiff requests actual damages in an amount to be determined by the jury or the Court.

189. Plaintiff requests statutory damages where available under RESPA, the FCRA, the FDCPA, Michigan insurance law, Michigan conversion law, or other applicable law.

190. Plaintiff requests punitive damages where available, including under the FCRA for willful violations.

191. Plaintiff requests treble damages, costs, and reasonable attorney-fee relief where available under MCL 600.2919a(1) for statutory conversion.

192. Plaintiff requests a declaration of the rights and obligations of the parties concerning the $304,640.05 insurance payment, the mortgage-account accounting, foreclosure accounting, insurance benefits, USDA claim and lien records, and credit reporting.

193. Plaintiff requests a declaration, to the extent supported by the evidence, that the mortgage debt and lien should be deemed satisfied and discharged in full effective no later than the date the $304,640.05 insurance check cleared or was received and controllable by Shellpoint/NewRez, or alternatively that the debt, lien, foreclosure, redemption, and credit-reporting figures must be recalculated as of that date.

194.    Plaintiff requests an order requiring correction, release, discharge, expungement, cancellation, or other appropriate remedial action concerning foreclosure deed records, lien records, servicer records, USDA claim records, and credit-reporting records to the extent those records are shown to rest on the artificial default or unreconciled insurance-payment accounting.

195.    Plaintiff requests a complete accounting of the loss-draft payment, foreclosure-sale proceeds, escrow activity, lender-placed-insurance charges and refunds, advances, fees, payoff figures, redemption figures, USDA records, title and lien records, and any surplus or deficiency calculation.

196.    Plaintiff requests an accounting that specifically determines the true amount due, if any, after applying the $304,640.05 insurance payment, approximately $25,501.00 foreclosure auction or sale amount, approximately $1,801.65 escrow or lender-placed-insurance refund, $841.30 unapplied funds, fee waivers, payoff adjustments, forbearance corrections, improper charges, and all other credits, proceeds, refunds, recoveries, or offsets.

197.    Plaintiff requests declaratory and equitable relief determining whether the mortgage was paid, satisfied, or otherwise required to be discharged, released, or corrected under the loan documents, payoff terms, and Michigan mortgage-discharge law, including MCL 565.41 and MCL 565.44 to the extent applicable.

198.    Plaintiff requests correction, deletion, suppression, or modification of inaccurate, incomplete, misleading, or unverifiable credit reporting where permitted by law.

199.    Plaintiff requests pre-judgment and post-judgment interest.

200.    Plaintiff requests costs, expenses, and fees where permitted by law.

201.    Plaintiff requests such other and further relief as the Court deems just, equitable, and proper.

40

## VIII. JURY DEMAND

202.    Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

Robert M. McAlkich III
8698 Community Boulevard
Warren, Michigan 48093
Phone: (231) 413-8458
Email: mcalkich9716285110@gmail.com
Plaintiff, pro se
Date: June 25, 2026

## CERTIFICATE OF SERVICE

I certify that on June 25, 2026, I served a copy of the foregoing document by email, pursuant to written consent to email service for filings and scheduling papers under Fed. R. Civ. P. 5, on counsel for the appeared Defendants at the following email addresses:

AJ Fabianczyk,
Counsel for NewRez LLC d/b/a Shellpoint Mortgage Servicing
AJ.Fabianczyk@huschblackwell.com

Walter J. Fitzgibbons,
Counsel for State Auto Property and Casualty Insurance Company
Walter.Fitzgibbons@libertymutual.com

Jordan Bolton,
Counsel for Equifax Information Services LLC
JBolton@taftlaw.com

Jenn Ziemann,
Counsel for Equifax Information Services LLC
jenn.ziemann@equifax.com

Chelsea Gornbein,
Counsel/legal assistant for Equifax Information Services LLC
CGornbein@taftlaw.com

Plaintiff further certifies that service by email is made for filings and scheduling papers under Fed. R. Civ. P. 5 based on written consent and does not waive or replace Rule 4 service for any newly added, corrected, unserved, or non-appearing defendant unless service is waived, accepted, or otherwise ordered by the Court.

Robert M. McAlkich III
Plaintiff, pro se
Date: June 25, 2026