**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| ROBERT M. McALKICH III,<br>Plaintiff,<br>v.<br>SHELLPOINT MORTGAGE SERVICING, LLC, formerly known as NEWREZ LLC, d/b/a SHELLPOINT MORTGAGE SERVICING,<br>STATE AUTO PROPERTY AND CASUALTY INSURANCE COMPANY,<br>EQUIFAX INFORMATION SERVICES LLC,<br>STERLING CLAIMS MANAGEMENT, INC.,<br>TRANS UNION LLC,<br>EXPERIAN INFORMATION SOLUTIONS, INC.,<br>Defendants. | **Case No. 1:26-cv-00468-PLM-RSK**<br>Hon. Paul L. Maloney<br>Magistrate Judge Ray Kent<br><br>**EXHIBIT A - CORRECTED PROPOSED SECOND AMENDED COMPLAINT AND JURY DEMAND** |

## PARTY, COUNSEL, AND SERVICE INFORMATION

**PLAINTIFF - PRO SE**
Robert M. McAlkich III
8698 Community Boulevard,
Warren, Michigan 48093
(231) 413-8458 |
mcalkich9716285110@gmail.com

**NEWREZ/SHELLPOINT**
A J Fabianczyk, Husch Blackwell LLP
120 S. Riverside Plaza, Suite 2200, Chicago, Illinois 60606
aj.fabianczyk@huschblackwell.com
Additional correspondence:
Laura.Conroy@huschblackwell.com

**STATE AUTO**
Stephen P. Brown, Plunkett Cooney, P.C.
38505 Woodward Avenue, Suite 100, Bloomfield Hills, Michigan 48304
(248) 594-6304 |
sbrown@plunkettcooney.com

**EQUIFAX**
Heather H. Sharp, Seyfarth Shaw LLP
1075 Peachtree Street, Suite 2500, Atlanta, Georgia 30309
hsharp@seyfarth.com
Additional correspondence: Ritika Singh, (469) 608-6763,
risingh@seyfarth.com; Jennifer R. Brooks, jrbrooks@seyfarth.com

**EQUIFAX**
Jordan S. Bolton, Taft Stettinius & Hollister LLP
27777 Franklin Road, Suite 2500, Southfield, Michigan 48034
jbolton@taftlaw.com

**PROPOSED RULE 4 SERVICE**
Sterling Claims Management, Inc. - c/o CSC - Lawyers Incorporating Service, 2710 Gateway Oaks Drive, Suite 150N, Sacramento, California 95833
Trans Union LLC - c/o CSC- Lawyers Incorporating Service (Company), 3410 Belle Chase Way, Suite 600, Lansing, Michigan 48911
Experian Information Solutions, Inc. - c/o The Corporation Company, 40600 Ann Arbor Road East, Suite 201, Plymouth, Michigan 48170

Plaintiff Robert M. McAlkich III, proceeding pro se, alleges as follows:

1

## I. NATURE OF THE ACTION

1.        This action arises from a January 16, 2023 fire loss at Plaintiff's home at 1610 Spencer Road SE, Kalkaska, Michigan; State Auto homeowners policy number 1001110558; mortgage loan number 9716285110; State Auto's $304,640.05 mortgagee insurance payment; Shellpoint/NewRez's servicing, accounting, payoff, foreclosure, escrow, and credit-furnishing conduct; and the later consumer-reporting and reinvestigation conduct of Equifax, Trans Union, and Experian.

2.        The central accounting event is a specific payment of $304,640.05, check number 1001366503, issued through the mortgagee claim process using payoff information associated with Plaintiff's loan. **(See ECF No. 28-3, PageID.231, 233 (EX-037 and EX-040).)**

3.        Plaintiff does not allege that the payment necessarily extinguished every component of the secured obligation on the date issued. Plaintiff alleges that the payment materially affected the amount due and required a timely, accurate, and transparent disposition under the loan documents and applicable servicing law before foreclosure continued.

4.        Shellpoint's later records reflected the $304,640.05 loss-draft transaction and a $314,608.67 "Foreclosure (Cash)" transaction on or about February 23, 2024, after the foreclosure sale. **(See ECF No. 28-3, PageID.241-242 (EX-042).)**

5.        Plaintiff alleges that Shellpoint failed to provide a coherent pre-sale accounting reconciling the insurance proceeds, payoff figures, escrow, unapplied funds, foreclosure amount, and later liquidation entries. **(See ECF No. 28-3, PageID.233, 237, 241-242, and 264-265 (EX-040, EX-041, EX-042, and EX-050).)**

6.        Plaintiff further alleges that Shellpoint and the consumer reporting agencies continued furnishing, reporting, verifying, or failing to correct materially misleading mortgage information after disputes identifying the insurance-payment and foreclosure-accounting

2

conflict. The filed record includes a January 2024 Shellpoint credit screenshot, Trans Union dispute-result materials, Equifax dispute-result and tradeline pages, and an Experian mortgage-tradeline page. **(See ECF No. 28-3, PageID.278, 287-291, 295-298, and 304 (EX-093, EX-141, EX-146, and EX-151).)**

7.      Plaintiff seeks damages and appropriate declaratory and accounting relief. Plaintiff does not seek to impose liability on all defendants for the same conduct; each count identifies the defendant and duty at issue.

## II. PARTIES

8.      Plaintiff Robert M. McAlkich III is a natural person and consumer residing in Michigan. His mailing address is 8698 Community Boulevard, Warren, Michigan 48093. He is the borrower on loan number 9716285110 and owned the real property at 1610 Spencer Road SE, Kalkaska, Michigan 49646 (the "Property"). **(See ECF No. 28-3, PageID.178, 182-183 (EX-001 and EX-002).)**

9.      Defendant presently captioned as Shellpoint Mortgage Servicing, LLC ("Shellpoint") serviced Plaintiff's mortgage loan during the events alleged. Shellpoint correspondence identifies the account as serviced by Shellpoint Mortgage Servicing on behalf of NewRez LLC d/b/a Shellpoint Mortgage Servicing. Plaintiff intends to proceed against the entity responsible for the servicing, payoff, loss-draft, foreclosure, and furnishing conduct alleged and does not concede any corporate-identity or misnomer defense. Shellpoint issued payoff statements, handled the insurance loss draft and account history, caused or controlled foreclosure activity, and furnished or maintained mortgage information reflected in consumer-reporting records. **(See ECF No. 28-3, PageID.198, 233, 237, 241-242, 262-265, 295-298, and 304 (EX-005, EX-040, EX-041, EX-042, EX-050, EX-146, and EX-151).)**

3

10. Defendant State Auto Property and Casualty Insurance Company ("State Auto") issued homeowners policy number 1001110558 covering the Property and handled claim number PR-0000000-467718. **(See ECF No. 28-3, PageID.208, 220, and 231 (EX-029, EX-035, and EX-037).)**

11. Defendant Sterling Claims Management, Inc. ("Sterling") participated in the mortgagee insurance-claim and loss-draft process concerning Plaintiff, the Property, State Auto claim number PR-0000000-467718, and loan number 9716285110. Sterling communicated mortgagee-claim information, requested a loss draft payable to Shellpoint for Plaintiff's account, supplied or transmitted payoff-backed claim materials, and was later identified as payee on a substantial insurance-cost disbursement in Shellpoint's account history.

12. Defendant Equifax Information Services LLC ("Equifax") is a consumer reporting agency within the meaning of the Fair Credit Reporting Act ("FCRA") and maintained, reported, or reinvestigated information concerning Plaintiff's Shellpoint mortgage tradeline.

13. Defendant Trans Union LLC ("Trans Union") is a consumer reporting agency within the meaning of the FCRA and maintained, reported, or reinvestigated information concerning Plaintiff's Shellpoint mortgage tradeline.

14. Defendant Experian Information Solutions, Inc. ("Experian") is a consumer reporting agency within the meaning of the FCRA and maintained, reported, or reinvestigated information concerning Plaintiff's Shellpoint or NR/SMS/CAL mortgage tradeline.

### III. JURISDICTION, PERSONAL JURISDICTION, AND VENUE

15. This Court has federal-question jurisdiction under 28 U.S.C. § 1331 because this action includes claims under the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2605, Regulation X, and the FCRA, 15 U.S.C. § 1681 et seq.

16.    This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over the related Michigan claims because they arise from the same loan, insurance payment, foreclosure, and resulting injuries.

17.    The Court has personal jurisdiction over Shellpoint because Shellpoint serviced and enforced a Michigan mortgage, communicated with a Michigan borrower, directed conduct toward Michigan property, foreclosed in Michigan, and furnished information concerning the Michigan loan.

18.    The Court has personal jurisdiction over State Auto because State Auto issued a policy covering Michigan property to a Michigan insured and adjusted the Michigan fire loss and mortgagee payment.

19.    The Court has personal jurisdiction over Sterling because Sterling purposefully directed mortgagee-claim, payment-routing, and loan-related conduct toward a Michigan insured, Michigan real property, and a Michigan mortgage loan, and its alleged conduct caused effects in Michigan.

20.    The Court has personal jurisdiction over Equifax, Trans Union, and Experian because each conducted consumer-reporting and reinvestigation activity directed to Plaintiff, a Michigan resident, concerning a Michigan mortgage account, and each purposefully provided or maintained consumer-reporting services affecting Plaintiff in Michigan.

21.    Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions occurred in this District and the Property is located in Kalkaska County, Michigan.

22.    Kalkaska County is assigned to the Southern Division of this Court under W.D. Mich. LCivR 3.2.

5

## IV. FACTUAL ALLEGATIONS

### A. LOAN, POLICY, AND FIRE LOSS

23.    Plaintiff obtained the mortgage loan in April 2021. The original principal amount was approximately $302,929.00. **(See ECF No. 28-3, PageID.178 (EX-001).)**

24.    The loan was secured by a mortgage on the Property and was associated with a USDA Rural Development occupancy rider. Section 5 of the Mortgage provides that, unless the parties otherwise agree in writing, insurance proceeds "shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened." It further provides that, if repair is not economically feasible or the lender's security would be lessened, the proceeds "shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower." **(See ECF No. 28-3, PageID.186-187 and 196 (EX-002 and EX-004).)**

25.    Shellpoint began servicing the loan on or about November 2, 2022. **(See ECF No. 28-3, PageID.198-202 (EX-005).)**

26.    Shellpoint approved a forbearance plan dated January 26, 2023, covering January 1 through March 30, 2023. **(See ECF No. 28-3, PageID.204 (EX-012).)**

27.    State Auto policy number 1001110558 insured the Property during the March 26, 2022 through March 26, 2023 policy period. The declarations reflected dwelling coverage of approximately $321,700 and a $1,000 deductible. Coverage D stated: "If a loss covered under Section I makes that part of the 'residence premises' where you reside not fit to live in, we cover any necessary increase in living expenses incurred by you so that your household can maintain its normal standard of living." **(See ECF No. 28-3, PageID.208 and 212 (EX-029).)**

6

28.    On January 16, 2023, the Property suffered a catastrophic fire loss. Plaintiff reported the loss, and State Auto assigned claim number PR-0000000-467718. **(See ECF No. 28-3, PageID.220 (EX-035).)**

29.    State Auto's July 18, 2023 denial recited the January 31, 2023 reservation-of-rights and document request, the March 9, 2023 sworn-proof-of-loss request, and an extension of the proof-of-loss deadline to May 31, 2023. The denial also quoted the policy's requirement that noncompliance be prejudicial to State Auto. (See **ECF No. 28-3**, PageID.220-221 **(EX-035)**.) The selected policy excerpt already filed in the record contains a two-year "Suit Against Us" provision. (See **ECF No. 28-3**, PageID.215 **(EX-029)**.) Plaintiff further alleges that a separate Michigan endorsement tolls the contractual period from notice of loss until formal denial.

## B. MORTGAGEE PAYMENT AND SHELLPOINT ACCOUNTING

30.    On July 11, 2023, Shellpoint issued a payoff quote showing principal of $296,453.67, interest through August 11, 2023 of $13,810.76, fees of approximately $432.34, borrower funds owed of approximately $4,678.86, a borrower credit of $841.30, and a total payoff of approximately $314,534.33. **(See ECF No. 28-3, PageID.233 and 235 (EX-040).)**

31.    State Auto and its mortgagee-claim participants obtained payoff or mortgagee-interest information associated with Plaintiff's loan. **(See ECF No. 28-3, PageID.231 and 233 (EX-037 and EX-040).)**

32.    In June 2023, Sterling submitted or transmitted mortgagee-claim materials identifying Shellpoint as the client and servicer for loan number 9716285110 and instructed State Auto to make the loss draft payable to Shellpoint for the account of Robert McAlkich and to route the draft through Sterling. Sterling also represented that Shellpoint was servicing the

7

mortgage and that the mortgagee claim sought the loan balance because the Property had been reported as a total loss.

33.     Plaintiff did not select that routing structure, did not endorse the check, and did not contemporaneously receive the check, its endorsements, the mortgagee proof-of-loss materials, or a complete explanation of the coverage components and payoff calculation used to determine the payment.

34.     On August 4, 2023, State Auto issued check number 1001366503 in the amount of $304,640.05 to Shellpoint for the mortgagee interest associated with Plaintiff's loan. **(See ECF No. 28-3, PageID.231 (EX-037).)**

35.     State Auto later described the calculation as principal of $296,453.67 plus interest of $13,810.76, producing $310,264.43 as of August 11, 2023, less approximately $4,624.38 in per-diem adjustment and the $1,000 deductible, producing $304,640.05.

36.     On information and belief, Shellpoint received the check in August 2023 and the payment cleared on or about August 23, 2023. **(See ECF No. 28-3, PageID.229 and 231 (EX-036 and EX-037).)**

37.     Shellpoint's account history reflects an August 22, 2023 transaction described as a $304,640.05 "Loss Draft Payment," check type, Batch ID 1163634. The displayed principal balance remained $296,453.67, the escrow balance remained negative, and the unapplied-funds balance remained $841.30.

38.     Shellpoint's account history further reflects an "Insurance Cost Disb" transaction of $47,004.61, effective August 31, 2023 and posted on September 25, 2023, identifying Sterling Claims Management, Inc. as payee, ACH reference 163730, Batch ID 1186816, and invoice SP083123. The displayed principal balance remained $296,453.67.

8

39. Plaintiff does not presently allege the source account, contractual basis, authorization, invoice basis, ultimate recipient, or final disposition of the $47,004.61 transaction as established facts. Those matters are contained in Defendants' native servicing, banking, vendor, invoice, and claims-management records. The entry supports discovery concerning whether Sterling's role extended beyond administrative communication and routing and whether the transaction was funded from, related to, or accounted against the identifiable insurance proceeds.

40. Shellpoint did not then provide Plaintiff with an intelligible loan-level statement identifying whether the money was applied to principal and interest, held as restricted loss-draft funds, transferred, reversed, placed in suspense, or otherwise treated. The Mortgage separately states that an application of insurance proceeds to principal "shall not extend or postpone the due date, or change the amount, of the Periodic Payments." Plaintiff therefore does not allege that receipt or posting automatically cured every preexisting default; he alleges that Shellpoint was still required to identify and accurately account for the resulting principal, interest, escrow, payoff, and foreclosure effect. **(See ECF No. 28-3, PageID.185 and 241-242 (EX-002 and EX-042).)**

41. On September 14, 2023, after the mortgagee payment had issued, Shellpoint provided another payoff quote showing principal still at approximately $296,453.67 and a total payoff of approximately $319,661.43. **(See ECF No. 28-3, PageID.237 and 239 (EX-041).)**

42. The September payoff quote did not display a corresponding reduction or otherwise explain how the $304,640.05 payment affected the debt. **(See ECF No. 28-3, PageID.237 and 239 (EX-041).)**

43.    Shellpoint continued response and loss-mitigation communications. The ECF-filed packet includes an October 17, 2023 letter stating that Shellpoint was gathering requested information, a November 14, 2023 SPOC assignment, a November 10, 2023 letter requesting additional time because of the matter's complexity, and later acknowledgment or delay letters. (See **ECF No. 28-3**, PageID.267, 269, and 273-276 (**EX-075**).) Separate Shellpoint correspondence dated October 18, November 28, and December 5, 2023 stated that larger-loss proceeds would be placed in restricted escrow, required a complete itemized adjuster's report, invited Plaintiff to a foreclosure-prevention outreach event, and stated that Shellpoint was unable to proceed until listed rebuild documents were supplied.

44.    Shellpoint records also continued to reflect or address lender-placed insurance, escrow activity, and a persistent $841.30 unapplied-funds balance. Section 1 of the Mortgage provides that if unapplied funds are not returned or applied earlier, "such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure." **(See ECF No. 28-3, PageID.184 and 241-249 (EX-002 and EX-042).)**

## C. FORECLOSURE, POST-SALE ENTRIES, AND REDEMPTION

45.    A foreclosure notice dated August 3, 2023 allegedly scheduled a sale for September 21, 2023, but that sale was not completed. Section 22 of the Mortgage requires an acceleration notice to specify the default, the action required to cure, and a cure date of at least thirty days, and to inform the borrower of "the right to bring a court action to assert the non-existence of a default or any other defense ... to acceleration and sale." **(See ECF No. 28-3, PageID.192-193 (EX-002).)**

46.    A later foreclosure notice dated January 4, 2024 stated that approximately $322,534.42 was due. **(See ECF No. 28-3, PageID.264 (EX-050).)**

47. The foreclosure sale occurred on or about February 15, 2024 for approximately $25,500. **(See ECF No. 28-3, PageID.262 and 265 (EX-050).)**

48. On February 23, 2024, Shellpoint's account history reflected a negative $304,640.05 "Loss Draft Payment," a negative liquidation-proceeds payment of approximately $4,414.71, a negative escrow-only payment of approximately $9,173.71, and a positive $314,608.67 "Foreclosure (Cash)" transaction. **(See ECF No. 28-3, PageID.241-242 (EX-042).)**

49. Those entries were recorded after the sale and require explanation because the same $304,640.05 payment had been issued and cleared approximately six months earlier. Section 22 of the Mortgage further states that foreclosure-sale proceeds are applied first to sale expenses, then "to all sums secured by this Security Instrument," and then any excess to the person or persons legally entitled to it. **(See ECF No. 28-3, PageID.193, 231, 241-242, 262, and 265 (EX-002, EX-037, EX-042, and EX-050).)**

50. The sheriff's deed was recorded on March 6, 2024. **(See ECF No. 28-3, PageID.262 (EX-050).)**

51. A redemption affidavit signed by Jennifer Gail Hood stated that the ordinary redemption deadline was August 15, 2024, but that the redemption period could be shortened if the Property were determined abandoned under Michigan law. (See **ECF No. 28-3**, PageID.259 **(EX-050)**.) To protect and complete the redemption, Plaintiff retained Melvin J. Babi and Babi Legal Group, P.L.L.C., and incurred an exact $5,000 retainer for redemption-related legal services, including communicating with Hood concerning Plaintiff's exercise of the redemption right.

52. Because Plaintiff's credit condition prevented him from qualifying personally for the required financing, Plaintiff arranged for his partner, Erin Byrne, to obtain an unsecured

11

Cross River Bank/Best Egg loan on March 23, 2024. The loan agreement identifies Byrne as borrower and states an original principal amount of $35,000, a $2,446.50 origination fee, $32,553.50 in net proceeds, a 17.56% interest rate, fifty-nine scheduled monthly payments of $880.41, and a final payment of any remaining principal, interest, fees, and charges.

53.     Of the $32,553.50 in net proceeds, approximately $26,039.72 was used to redeem the Property, exactly $5,000 was used for the Babi Legal Group retainer, and approximately $1,500 was used for title or closing services associated with redemption. Those uses consumed substantially all of the net proceeds. The Property was redeemed on or about May 7, 2024, and the certificate of redemption was recorded on June 7, 2024. Plaintiff alleges that a timely and accurate pre-sale accounting would have allowed him to challenge the stated foreclosure amount, seek appropriate relief before sale, and avoid or reduce the redemption, legal, closing, and high-cost financing expenses. Plaintiff seeks only actual, nonduplicative damages and does not seek both the loan principal and the same expenditures funded by the loan as separate losses.

54.     After foreclosure, Shellpoint submitted or participated in USDA guaranteed-loan claim processing. USDA materials later obtained by Plaintiff treated the $304,640.05 insurance payment as other recovery, requested insurance-related documents, and reflected a zero-paid claim determination in October 2024. Plaintiff does not allege that USDA paid Shellpoint a guarantee claim.

55.     USDA records later obtained by Plaintiff reflect that NewRez/Shellpoint transmitted a guaranteed-loan loss claim on August 13, 2024. The requested supporting materials included servicing history, foreclosure and redemption records, an adjuster report, settlement explanation, and hazard-insurance documentation.

56.     USDA thereafter requested insurance-adjuster information, and the lender-side response reflected that no adjuster report was available. USDA treated the $304,640.05 insurance proceeds as "other recovery" and reached a zero-paid determination. Plaintiff does not allege that USDA paid Shellpoint or NewRez any guarantee proceeds.

57.     The USDA materials also reflect a January 8, 2024 post-fire valuation of approximately $34,000 and a Michigan bid methodology of seventy-five percent, corresponding to an approximately $25,500 foreclosure bid. Plaintiff does not allege that the percentage calculation alone was unlawful. Plaintiff alleges that discovery is required to determine how Shellpoint separately treated the low post-fire collateral value, the $304,640.05 loss-draft balance, the asserted secured debt, the foreclosure bid, and the later liquidation accounting.

58.     The same production includes an internal Shellpoint instruction referring to "BLANKET APPROVAL TO NOT USE LDF AS A CREDIT ON BID." Plaintiff alleges that the native email chain, governing policy, bid-backup package, approvals, and loan-specific application of that instruction are within Shellpoint's possession and are directly relevant to the pleaded accounting, foreclosure, conversion, and damages theories.

### D. WRITTEN SERVICING NOTICES AND REQUESTS

59.     Plaintiff sent written servicing notices and information requests dated November 25, 2024; December 4, 2024; December 7, 2024; December 25, 2024; January 6, 2025; January 7, 2025; January 8, 2025; and January 13, 2025.

60.     The writings were sent to Shellpoint Mortgage Servicing, P.O. Box 10826, Greenville, South Carolina 29603-0826.

61.     Each writing identified Plaintiff or the loan and, as shown in the writing itself, asserted one or more servicing errors or requested information concerning receipt and application

13

of the $304,640.05 insurance proceeds, the account balance, payoff and foreclosure figures, escrow, lender-placed insurance, the $841.30 unapplied funds, loss-draft records, or related servicing information.

62.    Shellpoint acknowledged or responded to the written inquiries but did not provide a complete loan-level accounting reconciling the insurance payment, payoff figures, foreclosure figures, post-sale entries, escrow, and unapplied funds. **(See ECF No. 28-3, PageID.267 and 270-276 (EX-075).)**

63.    Plaintiff incurred postage, copying, document-retrieval, repeated follow-up, accounting-review, and credit-correction costs after the written notices, and lost time attempting to obtain information that should have been supplied through a compliant response.

64.    Plaintiff also alleges continuing emotional distress and credit-related harm after the notices because the account and reporting remained unresolved. Plaintiff seeks only damages causally tied to actionable post-notice violations under RESPA.

## E. CONSUMER REPORTING AND DISPUTES

65.    The filed Equifax and Experian materials identify the Shellpoint/NewRez mortgage tradeline, and a January 2024 credit screenshot reflects NewRez-Shellpoint reporting. Plaintiff alleges that Shellpoint also furnished the account to Trans Union and other consumer reporting agencies. **(See ECF No. 28-3, PageID.278, 295-298, and 304 (EX-093, EX-146, and EX-151).)**

66.    Plaintiff alleges that the reporting was materially misleading because it communicated severe delinquency and foreclosure without accurately reconciling the August 2023 mortgagee payment, subsequent payoff figures, post-sale application entries, and disputed

14

forbearance or transfer history. **(See ECF No. 28-3, PageID.237, 241-242, 278, 295-298, 301, and 304 (EX-041, EX-042, EX-093, EX-146, EX-147, and EX-151).)**

67.    Plaintiff does not allege that a $0 current balance can never coexist with accurate historical delinquency. He alleges that the tradeline as a whole created a materially misleading impression because the large payment and disputed account treatment were not accurately reconciled with the derogatory history and foreclosure status. **(See ECF No. 28-3, PageID.278, 295-298, 301, and 304 (EX-093, EX-146, EX-147, and EX-151).)**

68.    On December 6, 2025, Plaintiff disputed the Shellpoint tradeline through Equifax. Equifax assigned confirmation number 5340574595.

69.    Equifax's December 6, 2025 packet contained pages prepared for Robert M. McAlkich III, while its mailing face was addressed to Andrea F. Dimarco at Plaintiff's address. Plaintiff pleads this as an identity-matching or file-handling indicator, not as conclusive proof that another consumer's credit accounts were placed in his file.

70.    Equifax reported or maintained a $0 balance together with severe past-due and foreclosure coding. Plaintiff disputed the completeness and accuracy of the overall reporting and provided information concerning the insurance payment and account history. **(See ECF No. 28-3, PageID.295-298 and 301 (EX-146 and EX-147).)**

71.    Equifax thereafter issued dispute results but did not correct the core reporting Plaintiff challenged or provide a meaningful explanation reconciling the large payment with the foreclosure and delinquency history. **(See ECF No. 28-3, PageID.295-298 (EX-146).)**

72.    Plaintiff disputed the Shellpoint tradeline with Trans Union during 2025. The ECF-filed Trans Union packet contains dispute-result materials dated December 28, 2025. (See

**ECF No. 28-3**, PageID.287-291 (**EX-141**).) Plaintiff also alleges that he received an earlier September 2025 result.

73. Plaintiff alleges that a separate Trans Union consumer report showed the NewRez-Shellpoint account ending 971628**** with a $0 balance, an update date of February 15, 2024, a pay status of more than 120 days past due, and the remark "FORECLOSURE COLLATERAL SOLD."

74. Plaintiff alleges that Trans Union's file also contained earlier Caliber reporting reflecting transfer or paying-as-agreed information inconsistent with Shellpoint's later severe delinquency history. Plaintiff disputed the inconsistency and the unreconciled insurance-payment accounting.

75. Experian's April 27, 2024 dispute result identified the NR/SMS/CAL account ending 971628XXXX as foreclosed and continued severe delinquency history.

76. The Experian result reflected that in August 2023 the tradeline showed a balance of approximately $318,642, a scheduled payment of approximately $1,641, and an amount paid of approximately $304,640, together with Plaintiff's consumer statement that the delinquency was due to delay in the insurance claim.

77. Experian later issued dispute results in March and April 2025 that verified or continued the disputed mortgage reporting. Plaintiff alleges those 2025 reinvestigations were independent violations occurring within the limitations period.

78. On information and belief, after the disputes the consumer reporting agencies furnished reports containing the challenged mortgage information to one or more authorized users. Discovery is required to identify each recipient and date.

16

## F. STATE AUTO NOTICE, PAYMENT DISCLOSURE, AND DELAYED DISCOVERY

79.    State Auto issued a coverage-denial letter dated July 18, 2023. The letter was addressed to the fire-damaged Property even though Plaintiff had been displaced. **(See ECF No. 28-3, PageID.220 (EX-035).)**

80.    The denial stated that it was sent by regular mail, certified mail, and electronic mail. The certified-mail materials were returned marked "unclaimed" and "unable to forward." **(See ECF No. 28-3, PageID.220 and 223-225 (EX-035).)**

81.    Plaintiff did not receive effective notice through the returned certified mailing and alleges that he did not receive or understand the denial and mortgagee-payment facts at the time State Auto claims they were transmitted electronically.

82.    On or about March 15, 2024, after Plaintiff contacted State Auto, State Auto or Liberty Mutual personnel supplied or re-supplied coverage and cashed-check materials, after the foreclosure sale had occurred. **(See ECF No. 28-3, PageID.229 (EX-036).)**

83.    On August 13, 2024, State Auto personnel confirmed that the $304,640.05 payment was made to the mortgage company for loan number 9716285110 and directed Plaintiff to the mortgage company for application information.

84.    Before foreclosure, Plaintiff repeatedly requested the amount, payees, coverage components, calculation, delivery, clearance, and intended account treatment of the mortgagee check. State Auto disclosed only limited information and at times declined to provide additional details because Plaintiff was not a named payee on the check.

85.    Plaintiff was repeatedly referred among State Auto, Sterling, Shellpoint, and foreclosure-related personnel. State Auto referred Plaintiff to Shellpoint concerning application; Sterling referred Plaintiff to the lender or servicer; and Shellpoint issued delay or complexity responses without supplying a complete pre-sale reconciliation.

17

86.     Plaintiff alleges that the payee structure created through the mortgagee-claim process was then used to deny him timely information about proceeds arising from his policy, Property, and loan, impairing his ability to challenge the debt and foreclosure before sale.

87.     Shellpoint-related communications later described the same proceeds in materially different ways, including as applied to principal, housed or held as loss-draft funds, and combined with foreclosure-sale proceeds to complete payoff. Plaintiff repeatedly requested the account-level postings and calculations necessary to reconcile those descriptions.

88.     In a January 27, 2025 response to the Michigan Department of Insurance and Financial Services, State Auto identified or supplied a payment ledger, mortgagee notice of loss, mortgagee proof of loss, payoff materials, policy materials, and correspondence, and stated that claim call logs existed.

89.     In October 2025, State Auto personnel told Plaintiff that everything available had been forwarded, that there was no adjuster report, and that there was no other or further information to provide. **(See ECF No. 28-3, PageID.227 (EX-036).)**

90.     Plaintiff alleges that the returned denial mailing, delayed production of payment records, referral to Shellpoint, and later inconsistent descriptions of available claim records prevented him from obtaining timely, complete information concerning the denial, payment, payee, calculation, and application of the mortgagee proceeds. **(See ECF No. 28-3, PageID.220, 223-225, and 227-229 (EX-035 and EX-036).)**

## G. DAMAGES

91.     The redemption transaction required approximately $26,039.72 for redemption, an exact $5,000 legal retainer, approximately $1,500 in title or closing charges, and a $2,446.50 financed origination fee. The redemption, legal, and estimated closing uses consumed

substantially all of the $32,553.50 in net proceeds. Those expenses were funded through a $35,000 Cross River Bank/Best Egg loan in Byrne's name at 17.56%, and Plaintiff alleges continuing financing and reimbursement-related harm arising from the redemption transaction, subject to proof and without duplicate recovery.

92.     Plaintiff incurred interest, fees, postage, copying, document-retrieval, travel, accounting-review, and other out-of-pocket costs.

93.     Plaintiff suffered loss of credit opportunities, increased borrowing costs, reputational injury, loss of time, and emotional distress to the extent recoverable and causally attributable to each defendant's actionable conduct.

94.     Plaintiff will identify defendant-specific damages through disclosures and discovery and does not seek duplicate recovery for the same injury.

## V. CLAIMS FOR RELIEF

### COUNT I - RESPA AND REGULATION X AGAINST SHELLPOINT

95.     Plaintiff incorporates paragraphs 1 through 94 to the extent relevant to this count.

96.     Shellpoint was a servicer within the meaning of 12 U.S.C. § 2605(i)(2) and Regulation X.

97.     The writings dated November 25, 2024 through January 13, 2025 identified Plaintiff and the loan and asserted servicing errors and/or requested servicing information within 12 C.F.R. §§ 1024.35 and 1024.36.

98.     Shellpoint failed to conduct a reasonable investigation, failed to correct actionable errors, and/or failed to provide responsive information and a sufficient written explanation within the applicable requirements. **(See ECF No. 28-3, PageID.267 and 270-276 (EX-075).)**

99. The alleged failures included not reconciling the receipt and disposition of the $304,640.05 insurance payment with the payoff, foreclosure, escrow, unapplied-funds, and post-sale account entries. **(See ECF No. 28-3, PageID.231, 233, 237, 241-242, and 264-265 (EX-037, EX-040, EX-041, EX-042, and EX-050).)**

100. As a direct result of the post-notice violations, Plaintiff incurred actual damages including postage, copying, record-retrieval, repeated follow-up, accounting-review, lost time, and other consequential harm attributable to deficient responses.

101. Plaintiff also alleges a pattern or practice of noncompliance based on multiple written requests and repeated materially incomplete responses, subject to proof in discovery.

102. Plaintiff seeks actual damages, any statutory damages authorized by 12 U.S.C. § 2605(f), costs, and other relief permitted by law.

## COUNT II - FCRA FURNISHER LIABILITY AGAINST SHELLPOINT

103. Plaintiff incorporates paragraphs 1 through 94 to the extent relevant to this count.

104. The filed Equifax and Experian materials identify the Shellpoint/NewRez mortgage tradeline, and a January 2024 credit screenshot reflects NewRez-Shellpoint reporting. Plaintiff alleges that Shellpoint furnished information concerning the mortgage account to Equifax, Trans Union, and Experian. **(See ECF No. 28-3, PageID.278, 295-298, and 304 (EX-093, EX-146, and EX-151).)**

105. After Plaintiff disputed the tradeline through the consumer reporting agencies, one or more agencies notified Shellpoint of the disputes under 15 U.S.C. § 1681i(a)(2).

106. After CRA notice, Shellpoint was required under 15 U.S.C. § 1681s-2(b) to conduct a reasonable investigation, review relevant information, report results, and correct, delete, or modify information found inaccurate or incomplete.

20

107.    Shellpoint had access to its own payoff quotes, check and loss-draft records, account history, foreclosure records, escrow records, and furnishing data. **(See ECF No. 28-3, PageID.231, 233, 237, 241-242, 262-265, and 278 (EX-037, EX-040, EX-041, EX-042, EX-050, and EX-093).)**

108.    Shellpoint nevertheless verified or continued furnishing severe delinquency and foreclosure information without reasonably reconciling the $304,640.05 payment, post-sale entries, payoff figures, and disputed account status. **(See ECF No. 28-3, PageID.231, 237, 241-242, 262-265, and 278 (EX-037, EX-041, EX-042, EX-050, and EX-093).)**

109.    The resulting reporting was inaccurate, incomplete, or materially misleading when viewed as a whole.

110.    Shellpoint's conduct was negligent and, to the extent shown by the evidence, willful.

111.    Plaintiff suffered actual damages after the CRA-notice investigations, including credit injury, lost credit opportunities, increased costs, lost time, and emotional distress. Plaintiff seeks relief under 15 U.S.C. §§ 1681n and 1681o.

## COUNT III - BREACH OF NOTE, MORTGAGE, AND SECURITY INSTRUMENT AGAINST SHELLPOINT

112.    Plaintiff incorporates paragraphs 1 through 94 to the extent relevant to this count.

113.    The Note, Mortgage, Security Instrument, and incorporated loan documents constitute a contract governing the secured debt, casualty-insurance proceeds, account application, notices, acceleration, and enforcement. **(See ECF No. 28-3, PageID.178-179, 182-193, and 196 (EX-001, EX-002, and EX-004).)**

114.    Shellpoint acted as the servicer and agent authorized to administer the loan and enforce the mortgage and was bound to perform the contractual servicing functions it undertook accurately and in good faith. **(See ECF No. 28-3, PageID.198-202 (EX-005).)**

115.    Plaintiff performed his contractual obligations to the extent required and practicable, and any further performance was excused or prevented to the extent Shellpoint failed to provide an accurate account, misapplied or failed to explain proceeds, or demanded an overstated amount.

116.    Shellpoint breached by failing to timely and accurately account for the $304,640.05 insurance proceeds; issuing payoff or foreclosure figures that did not transparently reconcile those proceeds; retaining or charging amounts not properly supported; and proceeding with foreclosure without a coherent statement of the amount due after disposition of the proceeds. **(See ECF No. 28-3, PageID.186-187, 231, 233, 237, 241-242, and 262-265 (EX-002, EX-037, EX-040, EX-041, EX-042, and EX-050).)**

117.    The July and September 2023 payoff quotes and February 2024 entries plausibly show that the payment was not timely reflected in the borrower-facing principal and payoff figures before sale. **(See ECF No. 28-3, PageID.233, 237, and 241-242 (EX-040, EX-041, and EX-042).)**

118.    The breaches caused redemption expense, financing costs, fees, accounting expense, and other foreseeable damages.

119.    Plaintiff seeks contract damages, an accounting, declaratory relief concerning the correct disposition of proceeds and balance, interest, and other relief permitted by Michigan law.

## COUNT IV - WRONGFUL FORECLOSURE, DECLARATORY RELIEF, AND ACCOUNTING AGAINST SHELLPOINT

120.    Plaintiff incorporates paragraphs 1 through 94 to the extent relevant to this count.

22

121.    Michigan foreclosure by advertisement required an operative default and compliance with the governing mortgage and statutory requirements. **(See ECF No. 28-3, PageID.192-193 and 264-265 (EX-002 and EX-050).)**

122.    Shellpoint pursued the February 2024 foreclosure using an amount that Plaintiff alleges did not accurately account for the previously received insurance proceeds, the $841.30 unapplied funds, escrow and insurance credits, and other applicable offsets. **(See ECF No. 28-3, PageID.237, 241-249, and 264-265 (EX-041, EX-042, and EX-050).)**

123.    The alleged irregularity is not merely that the sale price was low. It is that the amount asserted as due and used to continue foreclosure was not transparently reconciled with a mortgagee payment nearly equal to the loan principal and with account entries not reflected until after sale. **(See ECF No. 28-3, PageID.231, 237, 241-242, and 262-265 (EX-037, EX-041, EX-042, and EX-050).)**

124.    Plaintiff was prejudiced because the unreconciled amount deprived him of a fair opportunity to know the correct amount, challenge the foreclosure before sale, seek appropriate relief, or avoid the redemption financing and costs. **(See ECF No. 28-3, PageID.237, 241-242, 259, and 264-265 (EX-041, EX-042, and EX-050).)**

125.    Plaintiff redeemed the Property. He seeks damages and an accounting rather than relief inconsistent with the completed redemption, except to the extent further equitable relief is necessary to correct the lien, account, or public records.

126.    An actual controversy exists concerning the correct loan balance and the proper application of the insurance proceeds, foreclosure proceeds, escrow items, fees, unapplied funds, and later entries. **(See ECF No. 28-3, PageID.231, 237, 241-242, and 262-265 (EX-037, EX-041, EX-042, and EX-050).)**

127.    Plaintiff seeks a judicial accounting, declaratory relief, damages caused by the alleged foreclosure irregularity, and other relief available under Michigan law and 28 U.S.C. §§ 2201-2202.

## COUNT V - COMMON-LAW AND STATUTORY CONVERSION OF IDENTIFIABLE INSURANCE PROCEEDS, PLEADED IN THE ALTERNATIVE, AGAINST SHELLPOINT AND STERLING

128.    Plaintiff incorporates paragraphs 1 through 94 to the extent relevant to this count.

129.    This count does not allege a mere failure to pay a debt. The property at issue was a specific, identifiable, and traceable insurance-loss instrument and payment: check number 1001366503 and its proceeds in the exact amount of $304,640.05, associated with State Auto policy number 1001110558, claim number PR-0000000-467718, loan number 9716285110, and the Property.

130.    Plaintiff was the named insured, owner of the insured Property, borrower obligated on the mortgage loan, and person whose equity, redemption rights, lien rights, insurance interests, and account balance were directly affected by the payment. Plaintiff does not allege that he necessarily had an immediate right to physical possession of the entire check.

131.    Plaintiff alleges contractual, equitable, accounting, surplus, and possessory interests in the proceeds' restricted disposition. Under the Mortgage, the proceeds were to be used for repair or restoration when economically feasible, applied to the sums secured by the Mortgage when repair was not feasible or security would be impaired, and any excess paid to the person legally entitled to it. **(See ECF No. 28-3, PageID.186-187 (EX-002).)**

132.    Shellpoint's authority to initially receive or administer mortgagee proceeds, if established, did not create unrestricted beneficial ownership of the payment. Authorized custody became wrongful if Shellpoint controlled, transferred, reversed, concealed, used, or accounted

24

for the proceeds in a manner inconsistent with the Mortgage, the loss-draft process, the secured debt, or Plaintiff's remaining interests.

133. Shellpoint's own history reflects the $304,640.05 loss-draft posting in August 2023 without a contemporaneous displayed principal reduction, while Shellpoint continued publishing payoff, acceleration, delinquency, and foreclosure figures that did not transparently reconcile the payment.

134. After the February 15, 2024 foreclosure, Shellpoint's history reflects a coordinated February 23, 2024 batch containing a negative $304,640.05 Loss Draft Payment, a positive $314,608.67 Foreclosure (Cash) transaction, and related escrow, liquidation, cost, and unapplied-funds entries. **(See ECF No. 28-3, PageID.241-242 (EX-042).)**

135. Those facts plausibly allege dominion inconsistent with Plaintiff's rights and support tracing discovery into the original check, endorsements, deposit account, custodial account, restricted loss-draft account, suspense account, investor account, transaction codes, reversals, transfers, ledger entries, and audit history.

136. Sterling materially participated in the creation and operation of the payment route by communicating the mortgagee claim, identifying Shellpoint as servicer or client, supplying or transmitting payoff-backed claim information, instructing that the loss draft be payable to Shellpoint for Plaintiff's account, and directing delivery through Sterling.

137. Shellpoint's account history further identifies Sterling as payee of a $47,004.61 Insurance Cost Disb transaction effective August 31, 2023 and posted September 25, 2023, after the $304,640.05 loss-draft posting, while principal remained $296,453.67.

138. Plaintiff does not presently allege that the $47,004.61 transaction was necessarily drawn directly from the $304,640.05 proceeds or that Sterling retained the entire amount.

Plaintiff alleges that the transaction, ACH reference, batch, invoice, funding source, authorization, contractual basis, and recipient records are peculiarly within Shellpoint's and Sterling's possession.

139. To the extent discovery establishes that Sterling possessed, received, controlled, directed, retained, concealed, or obtained a financial benefit from the identifiable proceeds or a transaction funded or accounted against those proceeds without lawful authority, Sterling exercised dominion inconsistent with Plaintiff's rights.

140. For common-law conversion, Plaintiff alleges that each defendant's distinct acts denied, impaired, or were inconsistent with Plaintiff's rights in the specific proceeds and their legally restricted disposition. Shellpoint's alleged dominion concerns receipt, holding, posting, reversal, foreclosure integration, and account treatment. Sterling's alleged dominion concerns routing, payment instructions, the identified insurance-cost disbursement, and any receipt or control established through tracing discovery.

141. For statutory conversion, Plaintiff pleads in the alternative that discovery may establish that Shellpoint or Sterling employed the proceeds or their account effect for a purpose personal to that defendant's institutional or financial interests, or knowingly received, possessed, concealed, stored, or aided concealment of converted property within MCL 600.2919a.

142. Potential own-use purposes to be tested through discovery include vendor compensation, reimbursement, servicing advances, investor recovery, custodial transfers, foreclosure or liquidation accounting, avoidance or delay of lien satisfaction or surplus recognition, or another institutional financial purpose. Plaintiff does not allege that every listed purpose occurred.

143.    The allegations made on information and belief concern records primarily controlled by Defendants, including native check images and endorsements; bank, lockbox, ACH, and custodial records; loss-draft and suspense ledgers; invoices and vendor contracts; user-access logs; servicing notes; audit trails; internal approvals; communications among State Auto, Sterling, Shellpoint, banks, custodians, investors, foreclosure personnel, and USDA; and records explaining the $47,004.61 disbursement and February 23, 2024 liquidation batch.

144.    Plaintiff pleads conversion in the alternative to contract, RESPA, accounting, declaratory, and foreclosure theories under Federal Rule of Civil Procedure 8(d) and does not seek duplicate recovery.

145.    The alleged conversion caused redemption expense, financing costs, loss of use of money and property interests, impairment of equity, credit-related injury, out-of-pocket expense, lost time, and other damages recoverable upon proof.

146.    Plaintiff seeks actual damages for common-law conversion; the remedies authorized by MCL 600.2919a only if the statutory elements are proven; an accounting; interest; costs; and other appropriate relief.

## COUNT VI - FCRA AGAINST EQUIFAX

147.    Plaintiff incorporates paragraphs 1 through 94 to the extent relevant to this count.

148.    Equifax is a consumer reporting agency within the meaning of the FCRA.

149.    Plaintiff disputed the Shellpoint mortgage tradeline and identity/file-handling concerns on December 6, 2025, confirmation number 5340574595.

150.    The dispute identified objective information requiring more than a mechanical furnisher verification, including the near-payoff-sized insurance payment, severe delinquency progression, foreclosure reporting, later $0 balance, and the unreconciled account history.

151.     Equifax failed to conduct a reasonable reinvestigation under 15 U.S.C. § 1681i, failed to consider all relevant information, and failed to correct or delete information that was inaccurate, incomplete, materially misleading, or unverifiable.

152.     The Andrea F. Dimarco mailing face associated with Plaintiff's packet supports a plausible file-matching or identity-handling concern that Equifax was required to investigate reasonably.

153.     To the extent Equifax furnished consumer reports containing the challenged information to third parties, Equifax failed to follow reasonable procedures to assure maximum possible accuracy under 15 U.S.C. § 1681e(b).

154.     Equifax's conduct was negligent and, to the extent established by the evidence, willful.

155.     Plaintiff suffered actual damages after the dispute and reinvestigation, including credit injury, lost credit opportunities, increased borrowing costs, lost time, and emotional distress. Plaintiff seeks relief under 15 U.S.C. §§ 1681n and 1681o.

### COUNT VII - FCRA AGAINST TRANS UNION

156.     Plaintiff incorporates paragraphs 1 through 94 to the extent relevant to this count.

157.     Trans Union is a consumer reporting agency within the meaning of the FCRA.

158.     Plaintiff disputed the Shellpoint mortgage tradeline with Trans Union during 2025. The ECF-filed Trans Union packet contains dispute-result materials dated December 28, 2025. (See **ECF No. 28-3**, PageID.287-291 (**EX-141**).) Plaintiff also alleges that Trans Union issued an earlier September 2025 result.

159.     Plaintiff alleges that separate Trans Union reporting showed a $0 balance, a pay status of more than 120 days past due, a foreclosure-collateral-sold remark, and severe

28

delinquency history, while Plaintiff disputed the effect of the insurance payment, prior-servicer transfer or payment history, and foreclosure accounting.

160.    Trans Union failed to conduct a reasonable reinvestigation under 15 U.S.C. § 1681i and failed to correct or delete information that was inaccurate, incomplete, materially misleading, or unverifiable.

161.    To the extent Trans Union furnished reports containing the challenged information to third parties, it failed to follow reasonable procedures to assure maximum possible accuracy under 15 U.S.C. § 1681e(b).

162.    Trans Union's conduct was negligent and, to the extent established by the evidence, willful.

163.    Plaintiff suffered actual damages after the reinvestigations, including credit injury, lost credit opportunities, increased borrowing costs, lost time, and emotional distress. Plaintiff seeks relief under 15 U.S.C. §§ 1681n and 1681o.

## COUNT VIII - FCRA AGAINST EXPERIAN

164.    Plaintiff incorporates paragraphs 1 through 94 to the extent relevant to this count.

165.    Experian is a consumer reporting agency within the meaning of the FCRA.

166.    Experian's April 27, 2024 result reflected the disputed mortgage as foreclosed, severe delinquency history, an August 2023 balance of approximately $318,642, a scheduled payment of approximately $1,641, and an amount paid of approximately $304,640, together with Plaintiff's insurance-delay consumer statement.

167.    Plaintiff later disputed the mortgage reporting, and Experian issued reinvestigation results in March and April 2025 verifying or continuing the challenged tradeline.

168.    The 2025 reinvestigations were unreasonable because Experian's own records displayed the large payment and the insurance-delay dispute while continuing the severe delinquency and foreclosure history without a coherent reconciliation.

169.    Experian failed to conduct a reasonable reinvestigation under 15 U.S.C. § 1681i and failed to correct or delete information that was inaccurate, incomplete, materially misleading, or unverifiable.

170.    To the extent Experian furnished reports containing the challenged information to third parties, it failed to follow reasonable procedures to assure maximum possible accuracy under 15 U.S.C. § 1681e(b).

171.    Experian's conduct was negligent and, to the extent established by the evidence, willful.

172.    Plaintiff suffered actual damages after the 2025 reinvestigations, including credit injury, lost credit opportunities, increased borrowing costs, lost time, and emotional distress. Plaintiff seeks relief under 15 U.S.C. §§ 1681n and 1681o.

## COUNT IX - BREACH OF INSURANCE CONTRACT, STATUTORY INTEREST, AND DECLARATORY RELIEF AGAINST STATE AUTO

173.    Plaintiff incorporates paragraphs 1 through 94 to the extent relevant to this count.

174.    State Auto issued policy number 1001110558 to Plaintiff, and the January 16, 2023 fire occurred during the policy period. **(See ECF No. 28-3, PageID.208 and 220 (EX-029 and EX-035).)**

175.    Plaintiff timely reported the loss. Plaintiff complied with policy conditions to the extent practicable and disputes that any incomplete performance was material or prejudicial. In the alternative, further performance was excused, waived, or prevented to the extent State Auto's

conduct, Plaintiff's displacement, or ineffective communications prevented compliance. **(See ECF No. 28-3, PageID.220-221 (EX-035).)**

176.    State Auto denied or failed to pay benefits claimed for covered dwelling, other structures, personal property, loss of use or additional living expense, debris removal, and related loss, subject to the policy terms and proof. **(See ECF No. 28-3, PageID.208, 212, and 220-221 (EX-029 and EX-035).)**

177.    State Auto separately paid $304,640.05 through the mortgagee claim while failing to provide Plaintiff timely, effective, and complete information concerning the payee, calculation, check, clearance, and intended loan-account effect before foreclosure. **(See ECF No. 28-3, PageID.229 and 231 (EX-036 and EX-037).)**

178.    State Auto's July 18, 2023 denial was addressed to the fire-damaged Property; the certified mailing was returned unclaimed and unable to forward; and Plaintiff alleges that he did not receive effective notice through that mailing or contemporaneous electronic delivery. **(See ECF No. 28-3, PageID.220 and 223-225 (EX-035).)**

179.    State Auto or related personnel supplied or re-supplied denial and cashed-check materials in March 2024, after the foreclosure sale. (See **ECF No. 28-3**, PageID.229 **(EX-036)**.) Plaintiff alleges that State Auto provided additional payment information in August 2024.

180.    State Auto later identified records to the Michigan insurance regulator, including mortgagee claim documents, payment records, and call logs, while later telling Plaintiff that no other or further information existed. Plaintiff alleges those acts delayed discovery and support estoppel against strict reliance on notice and suit-limitation defenses.

181.    To the extent State Auto relies on the policy suit limitation, proof-of-loss, cooperation, examination, or notice conditions, Plaintiff alleges that application of those defenses

31

is barred or limited by waiver, estoppel, prevention, ineffective notice, delayed disclosure, and concealment of material payment information. Plaintiff alleges these facts support waiver, estoppel, prevention, delayed accrual, or other limitations on enforcement of the asserted defenses. **(See ECF No. 28-3, PageID.215, 220-225, and 227-229 (EX-029, EX-035, and EX-036).)**

182. State Auto's breaches caused unpaid policy-benefit damages, property and loss-of-use damages, expenses, delayed-discovery harm, and other consequential damages legally recoverable under the policy and Michigan law.

183. Plaintiff seeks contractual damages, interest under MCL 500.2006 to the extent benefits were overdue after satisfactory proof of loss, declaratory relief concerning the parties' policy rights and the effect of the mortgagee payment, and other relief permitted by law.

## VI. PRAYER FOR RELIEF

A. Enter judgment for Plaintiff on each claim proven;

B. Award actual damages against each responsible defendant in an amount determined at trial, without duplicate recovery;

C. Award statutory damages and punitive damages under the FCRA where authorized and proven;

D. Award statutory damages under RESPA where authorized and proven;

E. Award treble damages under MCL 600.2919a only if the statutory elements are proven;

F. Order a complete accounting of the $304,640.05 insurance payment, payoff figures, escrow, lender-placed insurance, unapplied funds, foreclosure proceeds, post-sale transactions, fees, credits, and the resulting loan balance;

G.    Declare the proper contractual disposition and account effect of the insurance proceeds and whether foreclosure amounts, lien records, or servicer records require correction;

H.    Award State Auto policy benefits and interest under MCL 500.2006 to the extent established;

I.    Award prejudgment and post-judgment interest and taxable costs;

J.    Grant corrective or equitable relief only to the extent available to a private plaintiff under the governing statutes and necessary to effectuate the judgment; and

K.    Grant such other relief as the Court deems just and proper.

## VII. JURY DEMAND

184.    Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

Robert M. McAlkich III
8698 Community Boulevard
Warren, Michigan 48093
Telephone: (231) 413-8458
Email: mcalkich9716285110@gmail.com
Plaintiff, pro se
Date: July 30, 2026